Gerald E. HULBERT, Plaintiff
and Respondent,

v.

The STATE of Utah, Defendant
and Appellant.

No. 16197.

Supreme Court of Utah.

Feb. 22, 1980.

Robert B. Hansen, Atty. Gen., Jack L. Crellin, Asst. Atty. Gen., Salt Lake City, for defendant and appellant.

Brant H. Wall, M. David Eckersley, Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Before us is an action, which Gerald E. Hulbert, pursuant to the provisions of Chapter 30a, Title 63, lodged against the State; to recover reasonable attorneys' fees and court costs he necessarily incurred in the successful defense of a series of grand jury indictments. The matter was tried before the court. Hulbert was awarded judgment in the sum of $62,384.99. The State appeals. We affirm. Costs to respondent. All statutory references are to Utah Code Annotated, 1953, as amended.

In 1975, while plaintiff was acting as Chairman and Director of the Utah State Liquor Control Commission, a state grand jury, over a period of several months, issued twelve indictments against him. These were for alleged acts or omissions committed by him, in his official capacity.

Hulbert retained the law firm of Rawlings, Roberts & Black to defend him. During a period of two and one-half years, the law firm devoted over 500 hours on plaintiff's behalf, made 65 court appearances, conducted two trials, and made two appeals. The result of this vigorous defense was the exoneration of plaintiff on all twelve indictments.

In 1977, the Legislature enacted Chapter 30a, Title 63. Section 3 of this act provided for retroactive application of its benefits, which made plaintiff eligible thereunder. Section 3 further provided that claims should be "filed in the manner provided in the Utah Governmental Immunity Act," Chapter 30, Title 63. Hulbert submitted to the Governor, Lieutenant Governor, and At-torney General his claim for attorneys' fees and costs, in the sum of $77,815.65. This claim was itemized and substantiated by affidavit. After expiration of the statutory (63–30–14) ninety-day period, without response from the State [the claim is deemed to have been denied under such circumstances], plaintiff filed his action in the District Court in accordance with 63–30–15.

After being awarded judgment, plaintiff modified the sum he had originally claimed to conform to the amount of the judgment and submitted the same to the board of examiners (63–30–23). Subsequent to hearings before the Board of Examiners, the Governor voted to approve the modified claim. The other two members of the Board voted to defer action, because the Attorney General represented he intended to appeal the judgment of the District Court.

However, on December 8, 1978, notice to the legislature in regard to the action of the Board was submitted by letter. The Legislature appropriated $50,000.00, as settlement of Mr. Hulbert's claim. A warrant for payment of this appropriation was issued by the Department of Finance, but the Attorney General has withheld this instrument.

On appeal, the State, represented by the Attorney General, contends the District Court was without jurisdiction to adjudicate plaintiff's claim, for jurisdiction to examine this claim against the State was vested exclusively in the Board of Examiners, under Article VII, Section 13, Constitution of Utah. The State reasons that since the Legislature did not provide funding at the time Chapter 30a, Title 63 was enacted, any claim submitted pursuant thereto falls within the purview of Article VII, Section 13, Constitution of Utah and Sections 63–6–1 and 10.

Section 63–30a–2 provides:

"If a state grand jury indicts an officer or employee, in connection with or arising out of any act or omission of that officer or employee during the performance of his duties, within the scope of his employ-

ment or under color of his authority, and that indictment is quashed or dismissed or results in a judgment of acquittal, unless the indictment is quashed or dismissed upon application or motion of the prosecuting attorney, that *officer or employee shall be entitled to recover* from the state the reasonable attorneys' fees and court costs necessarily incurred in the defense of that indictment." [Emphasis supplied]

Section 63–30a–3 provides:

"This act shall apply to claims arising prior to the effective date of this act so long as those claims are filed in the manner provided in the Utah Governmental Immunity Act and within two years after the cause of action arises."

Under Section 2 of this act the right is conferred on the officer or employee to recover his attorneys' fees and court costs under certain specified circumstances. Section 3 of the act provides the procedure for effecting this recovery.

The State urges Section 3, properly interpreted, does not provide the procedures set forth in the Governmental Immunity Act apply to a claim under Chapter 30a. According to the State, Section 3 merely requires a notice of retroactive claims be given by filing the same with the Attorney General and the state agency concerned.

In interpreting Section 3, it should be noted the term "notice" of claims is not used but merely the term "claims"; further it would have been a simple matter to designate the section number of the Governmental Immunity Act and stipulate those provisions solely were to apply to a claim under Section 63–30a. Secondly, the term "claim" is utilized to describe the subject matter throughout the Utah Governmental Immunity Act. Thirdly, Section 3 provides the officer's or employee's claims should be "filed in the manner provided in the Utah Governmental Immunity Act." The term "manner" is defined as ". . . (2) the mode or method in which something is done

or happens: a mode of procedure or way of acting. . . ."[1] Thus, it is consistent with the plain terms selected by the legislature, to interpret Section 3 as prescribing the mode of procedure set forth in the Governmental Immunity Act, as applicable to claims arising under Chapter 30a, Title 63.

Plaintiff here adhered to the appropriate procedures. He gave the requisite notice of claim in accordance with Section 63–30–12. There was no response to the claim within ninety days; thus it was deemed denied, 63–30–14. Since his claim was denied, plaintiff instituted an action in the district court, Section 63–30–15. Section 63–30–16, provides:

"The district courts shall have *exclusive original jurisdiction over any action* brought under this act and such actions shall be governed by the Utah Rules of Civil Procedure in so far as they are consistent with this act." [Emphasis supplied]

By the express provisions of Section 63–30–16, the District Court had exclusive, original jurisdiction. This provision is not in conflict with Article VII, Section 13, which provides in the pertinent provisions:

". . . They shall, also, constitute a Board of Examiners, with power to examine all claims against the State except salaries or compensation of officers fixed by law, and perform such other duties as may be prescribed by law; and no claim against the State, except for salaries and compensation of officers fixed by law, shall be passed upon by the Legislature without having been considered and acted upon by the said Board of Examiners."

This Constitutional provision seems designed for the purpose of creating an administrative body to resolve tort claims against the sovereign and to perform certain post-auditing tasks.[2]

---

1. Webster's Third International Dictionary.

2. 1966 Utah Law Review, pp. 351, 358, Flynn, *Constitutional Difficulties of Utah's Executive Branch and the Need for Reform.*

This Constitutional provision may well preclude the Legislature from delegating the power to examine and pass on all claims, except those specifically exempted, to any other board or officer in the executive branch,[3] but it does not inhibit the authority of the legislature to waive sovereign immunity and grant recourse to the citizens of this State in the courts. The Constitution, Article VIII, Section 1, clearly and specifically vests the Judicial power of the State in the courts. In Section 63–30a–2, the legislature provided that the "officer or employee shall be entitled to recover from the state." In Section 63–30a–3, the method for effecting such recovery was stated. The Attorney General in his concluding argument before the trial court conceded the legislature had waived sovereign immunity and enabled a suit of this type to be brought. The conclusion is compelling, the trial court had exclusive, original jurisdiction to adjudicate plaintiff's action to recover his claim from the State.

Provision is made for a claimant when he recovers judgment in Section 63–30–23, it provides:

"Any claim approved by the state as defined herein or any final judgment obtained against the state shall be presented to the office, agency, institution or other instrumentality involved for payment if payment by said instrumentality is otherwise permitted by law. If such payment is not authorized by law then said judgment or claim shall be presented to the board of examiners and the board shall proceed as provided in section 63–6–10, Utah Code Annotated, 1953."

Section 63–6–10, provides:

"If no appropriation has been made for the payment of any claim presented to the board, the settlement of which is provided for by law, or if any appropriation made has been exhausted, the board must audit the claim, and, if it is approved, must transmit it to the legislature with a statement of the reasons for the approval."

In contrast, claims which do not fall within the purview of the Governmental Immunity Act, are dealt with in Section 63–6–11, which provides:

"Any person having a claim against the state for which funds have not been provided for the payment thereof, or the settlement of which is not otherwise provided for by law, must present the same to the board of examiners, accompanied by a statement showing the facts constituting the claim."

The board has the authority to examine and adjust the claims referred to in Section 63–6–11 and to hear evidence in support or against them, Section 63–6–13; such a role is quasi-judicial in nature. In contrast, the board is consigned an auditing type of function, where sovereign immunity has been waived and the claim has been adjudicated before the courts. These distinctions are illustrated in *Thoreson v. State Boards of Examiners*.[4] There, a statute directing the Board to receive, audit and allow all claims for payment was held to be mandatory and not discretionary with the Board.

The *Thoreson* case arose as a consequence of a judicial determination that an act providing for the leasing of certain state lands was invalid. Subsequently, the legislature enacted a statute for the purpose of refunding to the lessees the money paid in pursuance of their void leases. The statute, Section 963, R.S. 1898, provided:

"The State Board of Examiners are hereby directed to receive, audit, and allow all just claims of persons who have paid moneys . . . in relation to the leasing of school lands, . . . ."

This Court observed there could be no doubt any amount paid by a lessee on a lease pursuant to a void act of the legislature was a just claim, within the meaning of that term, as used in Section 963. Nevertheless, it was urged the Board of Examiners could not audit and allow just

---

**3.** *Uintah State Bank v. Ajax*, 77 Utah 455, 466, 297 P. 434 (1931).

**4.** 19 Utah 18, 57 P. 175 (1899).

claims presented to it, without first sitting in judgment upon such claims and hearing the necessary evidence and making a proper investigation to determine whether claims came within the statutory class. This Court responded, pointing out the only investigation which the Board was authorized to make was whether the money claimed was paid in pursuance of the act of 1892 (the invalid act). This Court stated:

"The facts admitted by the appellant and found by the court show that the money claimed was paid by the relator's assignor in pursuance of the act of 1892. The money so paid was, as has already been shown, the money which the legislature intended should be refunded, and therefore any claim for money so paid is a just claim. The claim of the relator was not rejected because it was not paid in pursuance of the act of 1892, but because it had not reached the Territorial treasury.

"The appellant having admitted the facts which show that the relator's claim is a just one, and belongs to the class, the payment of which the legislature, in Section 963 of the Revised Statutes, intended to provide for, it became and was the imperative duty of the Board to audit and allow said claim; having failed to perform this duty, the writ of mandamus was properly issued." [5]

This Court elaborated on the concepts expressed in the *Thoreson* case in *State ex rel. Davis v. Cutler*.[6] Therein, it was urged a writ of mandate should not issue against the Board of Examiners for the reason that in passing upon claims against the state it acts in a quasi-judicial capacity and must therefore be permitted to exercise its discretion. This Court observed the board may exercise discretionary powers in the discharge of its official duty in considering claims against the state, but this discretion may not be arbitrarily exercised. This Court explained:

"... In this case the essential facts entitling the relator to have his claim audited and allowed are all admitted. The questions, therefore, are purely questions of law. If the claim, therefore, is one which is admitted to be just, and is authorized by law, and there is no dispute with regard to any fact involved, and the claim is presented to the board in due form as the law requires, we know of no law nor reason why respondents [Board of Examiners], although acting in a quasi judicial capacity, should not be required to audit and allow the claim. This is clearly the logic of the case of *Thoreson v. State Board of Examiners*, 19 Utah 18, 57 P. 175. ...

"In view of the conceded facts, there is nothing upon which the respondents can legally exercise any discretionary powers in this case, and therefore they should have audited and allowed the claim. ..."

■ By the same logic, where the State has waived its sovereign immunity and the matters concerning the claim have been litigated in the courts, Section 63–6–10 properly limits the authority of the Board of Examiners to an auditing function, whereupon the Board "must transmit it to the legislature." [7]

■ Defendant further contends the amount of attorneys' fees awarded by the trial court cannot be supported by the evidence as "necessarily incurred" under Section 63–30a–2. With this we do not agree.

The extravagant claims of defendant's brief and the aspersions cast on plaintiff and the trial court merit a brief response. There were meticulous findings of fact, which a careful survey of the record reveals were fully sustained by the evidence. The gravamen of defendant's contention centers on a letter written by plaintiff's counsel in

---

5. at pp. 27–28 of 19 Utah, at p. 177 of 57 P.

6. 34 Utah 99, 107–108, 95 P. 1071, 1074 (1908).

7. It should be observed the broad statement is *Toronto v. Clyde*, 15 Utah 2d 403, 405, 393 P.2d 795, (1964) that the Board of Examiners had more than a mere auditing function, was made prior to the enactment of the Utah Governmental Immunity Act, which was passed in 1965.

September 1976, which defendant contends constituted a binding agreement limiting attorneys' fees to $18,500, regardless of whether the evidence indicated the sum of $77,275.00 was within a reasonable range for attorneys' fees.

The first group of indictments were issued in May 1975, at this time plaintiff paid a $5,000 retainer. Later a second and third set of indictments were issued in July and August of 1975. The matter was vigorously prosecuted, and the defense was protracted, complicated, and time-consuming. Attendant publicity contributed to the task of defense counsel. Counsel deferred any discussion of fees because of the deterioration of plaintiff's physical and mental health during the protracted litigation. Plaintiff insisted on a billing in 1976. Counsel responded by a letter in September 1976, wherein he offered to consider $18,500 as a total fee, crediting towards that amount $8,500 which plaintiff had previously paid. Plaintiff, although ill and unemployed, responded that such a fee was token in nature and unacceptable to him. Subsequently, plaintiff and counsel orally agreed plaintiff would pay a reasonable and fair fee "if and when" plaintiff became able to do so. No accounting or itemization of services rendered was prepared at that time. Such a record was prepared by counsel in 1977 to support the claim plaintiff submitted to the Board of Examiners.

The record substantiates the finding of the trial court that plaintiff intended his obligation to be one for reasonable fees at a then undetermined level, and his counsel intended that the obligation would be contingent upon plaintiff's future ability to pay.[8]

The trial court further found the enactment of Chapter 30a, Title 63 was, in fact, the occurrence of the condition precedent or contingency, upon which plaintiff's obligation hinged. Plaintiff, thus, became obligated by his own promise to pay a reasonable fee for services rendered, and had "incurred" such a fee within the meaning of Section 63–30a–2.

Defendant characterizes the agreement of plaintiff to pay his counsel reasonable fees as a subsequent invalid agreement, and then argues the only enforceable claim was the amount of $18,500.00 as set forth in the letter of September 1976. Defendant premises its argument on a set of facts absolutely contrary to the facts as found by the trial court.[9] The fallacy of defendant's contention in regard to the letter of September 1976, viz., it alone is the only valid, binding agreement, can be illustrated by a simple substitution of amounts. If counsel had written a letter stating he would consider $100,000.00 as the total fee, and the client responded that sum was too much, but he would pay a reasonable amount when he was able, and counsel accepted this arrangement, would defendant insist the sum of $100,000.00 was an enforceable claim, although $65,000.00 was found to be a reasonable attorneys' fee?

---

8. Plaintiff's counsel testified:

"Well, Gerry said that he deeply appreciated my letter and my indications with regard to the fee. He said, 'I want you to know that that fee arrangement is entirely unacceptable to me, Wayne.' He said, 'I know that you have rendered services far, far beyond anything remotely resembling the figures that you state in that letter.' He said, 'I don't know when or how I am going to be able to do it, but,' he said, 'I'm not going to rest until I pay you something that is reasonable and that more nearly represents what you have done for me and for my family.'

"And I responded and I said, 'Well, Gerry, let's just kind of let it go and see what happens, and if you are able ever to do that, or to pay an additional amount, that would be fine with me, and I will kind of leave it up to you.'"

9. Defendant advanced a similar argument to support a motion to dismiss. The trial court stated: "The language of the letter itself indicates that it is somewhat tenuous, and substantiates the position that it was a proposed billing. The Court finds that the billing was not agreed upon, and was not accepted by Mr. Hulbert, and that additional discussions regarding contents of the letter and the subject of the billing itself resulted in an informal, but nevertheless binding, agreement by which Mr. Hulbert became obligated to pay a reasonable attorneys' fee if it were within his power, and it was a contingent agreement, obviously, but I think it did extend beyond the proposal made in the September 3rd letter, so I'm going to deny the motion to dismiss."

The trial court, based upon all the evidence, determined when plaintiff and his counsel reached an agreement regarding attorneys' fees and the terms of that agreement. There is no legal basis for an appellate court to disturb these findings under the circumstances set forth in the record.

Defendant further contends Section 63–30a–3 constituted retroactive legislation which extinguished the vested rights of the State of Utah in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Constitution of Utah. Defendant concedes this State has no specific constitutional prohibition against retroactive legislation as some states do. Defendant contends such retroactive legislation is prohibited by the Fourteenth Amendment when it divests any vested interest. Defendant argues the subject statute created an obligation on the part of the State, which did not exist at the time the events giving rise thereto occurred. As a consequence, the vested interest of the State was divested by imposition of this obligation in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7, Constitution of Utah.

This latter provision states:

"No *person* shall be deprived of life, liberty or property, without due process of law." [Emphasis supplied]

The relevant provisions of the Fourteenth Amendment state:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of *citizens* of the United States; nor shall any State deprive any *person* of life, liberty, or property, without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws." [Emphasis supplied]

Defendant cites no authority and we know of none to sustain its novel proposition that the State is a person or citizen to which the protection of these constitutional provisions extends. We adhere to the tradi-

tional concept, viz., these provisions were designed to protect the individual from state action and not the converse.

Finally, defendant contends the retrospective aspects of 63–30a–3 constituted a special law within the interdiction of Article VI, Section 26, Constitution of Utah, which provides:

"No private or special law shall be enacted where a general law can be applicable."

Defendant's argument is predicated on the testimony of plaintiff, i. e., he actively lobbied before the legislature to have the statute enacted. Defendant reasons, since the retroactive features of the legislation redound to the benefit of plaintiff, it must be deemed a special law.

First, it should be observed the constitutional inhibition against the enactment of a special or private law is qualified by the phrase "where a general law can be applicable." Therefore, mere proof that an enactment benefited or affected one individual is not indicative of a violation of this constitutional proscription. Otherwise, the Legislature would be prohibited from appropriating money in settlement of an individual's claim against the state.

Second, this Court has set forth the general definitions of general and special laws. In *Utah Farm Bureau Insurance Co. v. Utah Insurance Guarantee Ass'n*[10] this Court explained:

". . . A general law applies to and operates uniformly upon all members of any class, places, or things requiring legislation peculiar to themselves in matters covered by the laws in question. On the other hand, special legislation relates either to particular persons, places, or things or to persons, places, or things which, though not particularized, are separated by any method of selection from the whole class to which the law might, but for such legislation, be applied.

". . . a law is general when it applies equally to all persons embraced in a class founded upon some natural, intrin-

10. Utah, 564 P.2d 751, 754 (1977).

sic, or constitutional distinction. It is special legislation if it confers particular privileges or imposes peculiar disabilities, or burdensome conditions in the exercise of a common right; upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law. The constitutional prohibition of special legislation does not preclude legislative classification, but only requires the classification to be reasonable."

The officers and employees of a public entity constitute a distinct class for purposes of this legislation. The benefits of the statute are conferred on all persons embraced within this class, including those affected by the retrospective provisions of the act. Therefore, under the foregoing definitions, the legislation is a general law, in full compliance with Article VI, Section 26, Constitution of Utah.

WILKINS and STEWART, JJ., concur.

CROCKETT, C. J., concurs in result.

HALL, Justice (concurring and dissenting):

I concur with that portion of the majority opinion which holds that sovereign immunity has been waived for claims against the state for reimbursement of attorney fees and costs reasonably incurred in the successful defense of grand jury indictments; hence, I agree that the district court has jurisdiction over claims of this type. Furthermore, I agree that the retroactive application of the legislation is not invalid as violative of the constitutional provisions relating to due process and special laws.

However, it is my opinion that the trial court erred in the amount of attorney fees awarded. The majority opinion affirms the award as fees "necessarily incurred."[1] In the absence of an enforceable contract, the question of what is a reasonable attorney's fee depends upon a number of factors which are to be assessed by the trial court.[2]

In the instant case, however, we are dealing with an enforceable *contract* which by its own terms provides the reasonable value of the services necessarily incurred.

On September 3, 1976, Black wrote to Hulbert as follows:

Dear Jerry:

In a way I hate to write this letter because it is always unpleasant to bill a client who is a close friend and I had frankly decided that I would not bill you until the final case was disposed of, and, hopefully, disposed of in a favorable way. However, it does appear that there is a likelihood of considerable delay in the disposition of the final case, and, consequently, I thought I would write you a letter analyzing the fee situation.

You will recall that on May 22, 1975, I wrote you a letter outlining the fee situation. At that time only the one indictment had been presented and none of us had any way of knowing that the other indictments would be forthcoming. On the basis of the first indictment the agreement was that you would pay a $5,000 retainer, that if the case was tried one or more times an additional $5,000 fee would be charged, and that in the event the case was appealed an additional $2,000 fee would be charged.

Of course, the case was tried and in addition we have had two appeals to the Supreme Court with one involving the first indictment and one involving the later indictments. In addition, as you know, we have had another trial and arguments on innumerable motions. The possibility still exists of the necessity of trying the last remaining case.

*John and I have given this matter very considerable thought. You have paid up to date $8,500. Under the existing contract, on the first case, the remainder of the fee for said case, which is owing, is $3,500. We will consider the entire fee, including whatever procedures, whether it be a trial or something less than a trial, and also including a possible appeal, if*

---

1. U.C.A., 1953, 63–30a–2.

2. *Wallace v. Build, Inc.,* 16 Utah 2d 401, 402 P.2d 699 (1965).

*you paid an additional $10,000, to constitute the total fee. This $10,000 would, of course, include the $3,500 owed on the first case.* [Emphasis added.]

We will keep you advised of further developments in the remaining case.

On September 9, 1977,[3] Hulbert wrote to Black as follows:

Dear Mr. Black:

You have indicated that Mr. Joseph McCarthy, Deputy Attorney General, has suggested I write you a letter regarding our final understanding with regard to the attorneys fee in connection with my indictments.

My best recollection is that in early October of 1976 I was in your office and discussed this matter with you. At that time, I had paid a total of $8,500 on the fee. You indicated to me at that time you thought there was an excellent chance the remaining indictments would be dismissed and that you realized I had been through a hard financial time. You said if I paid an additional $10,000 or a total of $18,500.00, I could consider the attorneys fee paid in full and that I could have as much time as I needed to make the payment. I said I realized that this amount would nowhere near pay you and your firm for all you had done for me, and I told you how grateful I was for your help and friendship.

I am sure that a day or two after our conversation you sent me a letter confirming the above fee arrangement. My best recollection is that I received the letter shortly before October 8, 1976. I relate to this date because on said date I again came to your office and paid an additional $2,000.00. I believe that I returned the letter signed approved to your office.[4]

At your request, I have searched my personal effects in the event a copy of the letter might be among them, and I cannot find a copy. I am not really sure whether you sent me an extra copy.

I made one additional payment of $1,000 on the fee, bringing the total payments I have made to date up to $11,500.00.

The district court apparently ignored the contract by concluding that "the plaintiff intended his obligation to be one for reasonable fees at a then undetermined level." The correspondence having risen to the level of a contract clear on its face, it is not subject to parol modification.[5] Let us assume that Hulbert had been found guilty of the charges against him (and that the statute providing for reimbursement therefore did not apply). There is no conceivable basis upon which it could be successfully asserted that Hulbert necessarily incurred a fee greater than $18,500. The state's legal obligation for reimbursement can be no greater than Hulbert's own legal obligation to Black. The lower court erred in admitting parol evidence which conflicts with the unambiguous provisions of a written contract.[6]

Rather than ruling on the contract as a matter of law, the district court rendered judgment based on the parol evidence in the amount of $62,384.99. The claim (now reduced to judgment) was presented to the Board of Examiners. The majority of the

---

3.  After the subject statute had taken effect and a full year after Hulbert received the bill.

4.  Note that this refers to Black's September 3, 1976 letter, the original of which Hulbert apparently returned to Black "signed approved." This original letter (with the notation by Hulbert approving the fee arrangement) was not produced at trial; only a copy of the September 3 correspondence is contained in the record.

5.  After the attorney-client relationship has been entered into, the parties thereto may change the terms of their agreement or enter into an entirely new agreement, and if the substituted agreement was entered into after full

and fair disclosure by the attorney, such an agreement will be upheld. However, such contracts are looked upon with great suspicion by the courts, and there is a presumption that such agreements are invalid, especially where the result thereof is to increase the compensation to be received by the attorney, or is otherwise of greater advantage to him. *Skeen v. Peterson*, 113 Utah 483, 196 P.2d 708 (1948); see also *Ashton v. Skeen*, 85 Utah 489, 39 P.2d 1073 (1935).

6.  *Erickson v. Bastian*, 98 Utah 587, 102 P.2d 310 (1940).

Board voted to defer action on the claim, pending this appeal. Nevertheless, the Legislature appropriated $50,000 as settlement of the claim. Although the Legislature can properly reject a recommendation of the Board,[7] it cannot act upon a claim until a recommendation has been duly made.[8] To hold otherwise would defeat the state's right to appeal the district court's decision [9] which results, in my view, in a gross miscarriage of justice.

7. *Wood v. Budge*, 13 Utah 2d 359, 374 P.2d 516 (1962).

8. *Wilkinson v. State*, 42 Utah 483, 134 P. 626 (1913).

I would affirm the lower court's decision in all respects except that I would reduce the judgment to $18,500.

9. Utah Constitution, Article VIII, Section 9.