**BLUE CROSS AND BLUE SHIELD OF UTAH, a nonprofit corporation, Plaintiff and Appellant,**

v.

**STATE of Utah, Utah State Tax Commission, and Utah State Insurance Department, Defendants and Appellees.**

No. 19676.

Supreme Court of Utah.

July 19, 1989.

Rehearing Denied Sept. 19, 1989.

David R. Money, Salt Lake City, for plaintiff and appellant.

David L. Wilkinson, Stephen G. Schwendiman, Bruce H. Pettey, Mary Beth Walz, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice:

Plaintiff Blue Cross and Blue Shield of Utah ("Blue Cross"), a nonprofit health service corporation, appeals from a summary judgment granted against it and in favor of defendants State of Utah, Utah State Tax Commission, and Utah State Insurance Department (collectively, "the State"). This judgment upheld against state and federal constitutional challenge a pair of Utah tax statutes. Taken together, these statutes levied a 2.25 percent tax on subscription income received by nonprofit health service corporations and on premium income received by all other insurance companies in the state, but exempted from the tax the premium income received by insurance companies organized as mutual benefit associations ("MBAs"). Utah Code Ann. §§ 31–14–4(1), 31–37–9(2) (Supp. 1981).[1] We conclude that the tax scheme enacted by these statutes is constitutional; therefore, the trial court's ruling is affirmed.

Blue Cross initiated this action against the State, challenging the taxing scheme represented by sections 31–14–4(1) and 31–37–9(2) of the Code. It contended that MBAs were in all material respects indistinguishable from Blue Cross, a health service corporation, against which the MBAs competed directly. It also contended that by exempting MBAs from the 2.25 percent tax imposed on all other insurers, the legislature had placed Blue Cross at a competitive disadvantage and that in treating the MBAs and Blue Cross differently, the legislature had created a classification that bore no reasonable relation to the purpose of the taxing scheme, which was to raise revenue. Blue Cross attacked the taxing scheme under the equal protection clause of the fourteenth amendment to the United States Constitution as well as under the uniform operation of the laws provision and the special laws ban contained in the Utah Constitution. U.S. Const. amend. XIV, § 1; Utah Const. art. I, § 24; Utah Const. art. VI, § 26. Both Blue Cross and the State filed motions for summary judgment. The trial court granted the State's motion and denied that of Blue Cross, holding that as a matter of law, Blue Cross had not demonstrated the taxing scheme's unconstitutionality. Blue Cross appeals that determination.

A grant of summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *see, e.g., Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1384 (1989). In considering an appeal from a grant of summary judgment, we view the facts in a light most favorable to the losing party below. *E.g., Seftel v. Capital City Bank,* 767 P.2d 941, 946 (Utah Ct.App.1989); *Payne ex rel. Payne v. Myers,* 743 P.2d 186, 187–88 (Utah 1987). And in determining whether those facts require, as a matter of law, the entry of judgment for the prevailing party below, we give no deference to the trial court's conclusions of law: those conclusions are reviewed for correctness. *E.g., Bonham v. Morgan,* —— P.2d ——, ——

---

1. Title 31 of the Code has been repealed and replaced by title 31A. 1985 Utah Laws ch. 242, § 58, effective July 1, 1986. This opinion will address the constitutionality of the tax levied by title 31 because it was the law in effect at the time Blue Cross filed its first complaint. *See* Utah Code Ann. § 31A–1–202(2) (1986) ("An action or proceeding commenced under any law repealed by this title is not affected by the repeal.").

102 Utah Adv.Rep. 8, 9 (Feb. 23, 1989); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

Blue Cross renews on appeal all the challenges it made below. We consider first its claims that the taxing scheme violates both the equal protection clause of the federal constitution and the uniform operation of the laws provision of the Utah Constitution. U.S. Const. amend. XIV, § 1; Utah Const. art. I, § 24. We will then treat the assertion that the tax violates the special laws ban of article VI, section 26.

■ The principles and concepts embodied in the federal equal protection clause and the state uniform operation of the laws provision are substantially similar. *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988); *Malan v. Lewis*, 693 P.2d 661, 669–70 (Utah 1984). However, our examination into the reasonableness of economic legislation under article I, section 24 of the Utah Constitution is at least as vigorous as that required by the federal equal protection clause, and probably more so. *Mountain Fuel Supply*, 752 P.2d at 889, 890; *see Recent Developments*, 1989 Utah L.Rev. 143, 317. Therefore, if the statutes under attack can withstand scrutiny under article I, section 24, they will not be found to violate the federal equal protection clause. 752 P.2d at 890. Accordingly, we will consider Blue Cross's claims under article I, section 24.

■ Article I, section 24 of the Utah Constitution commands that "[a]ll laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. The concept underlying this provision is "the settled concern of the law that the legislature be restrained from the fundamentally unfair practice" of classifying persons in such a manner that those who are similarly situated with respect to the purpose of a law are treated differently by that law, to the detriment of some of those so classified. *Mountain Fuel Supply*, 752 P.2d at 888. In scrutinizing à legislative measure under article I, § 24, we must determine whether the classification is reasonable, whether the objectives of the legislative action are legit-

imate, and whether there is a reasonable relationship between the classification and the legislative purposes. 752 P.2d at 890; *see Malan*, 693 P.2d at 670–75.

■ It is important to note at the outset that our uniform operation of the laws analysis is guided by the well-settled proposition that all statutes are presumed to be constitutional and the party challenging a statute bears the burden of proving its invalidity. *City of West Jordan v. Retirement Bd.*, 767 P.2d 530, 537 (Utah 1988); *Baker v. Matheson*, 607 P.2d 233, 236 (Utah 1979); *State Tax Comm'n v. Wright*, 596 P.2d 634, 636 (Utah 1979). It is also important to note that although the broad outlines of the analytical model used in determining compliance with the uniform operation of the laws provision remain the same in all cases, the level of scrutiny we give legislative enactments varies. *See, e.g., Mountain Fuel Supply*, 752 P.2d at 888 n. 3; *Condemarin v. University Hospital*, 775 P.2d 348, 353–57 (Utah 1989) (opinions of Durham and Stewart, JJ.). In the tax area, as in other areas of purely economic regulation, we give broad deference to the legislature when scrutinizing the reasonableness of its classifications and their relationship to legitimate legislative purposes. *City of West Jordan*, 767 P.2d at 537; *Mountain Fuel Supply*, 752 P.2d at 888; *Baker*, 607 P.2d at 236. That broad deference leads us to sustain a classification if "facts can reasonably be conceived which would justify the distinctions or differences in state policy [expressed by the challenged legislation] as between different persons." *Baker*, 607 P.2d at 244 (citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)). We do not, however, "accept any conceivable reason for the legislation.... Rather, we judge such enactments on the basis of reasonable or actual legislative purposes." *Malan*, 693 P.2d at 671 n. 14.

■ Having stated the legal principles that govern our review of Blue Cross's claims, we proceed to the analysis, beginning with the statutory scheme, for it determines the classification at issue. Nor-

mally, there would be little dispute about the definition of the class to be tested. Here, however, where two sections of the Code combine to impose the taxes under attack, the classification issue is complicated. Section 31–37–9(2)[2] taxes at a 2.25 percent rate the premium income of all health service corporations, while section 31–14–4(1)[3] taxes at the same rate the premium income of all other insurers, but exempts MBAs.[4] The question is whether these two sections should be viewed separately, thereby placing Blue Cross in one class and all other insurers, including MBAs, in another, with members of each class subject to being compared only with other members of the same class, or whether the two sections should be viewed as part of one taxing scheme that classifies all insurers together, thereby permitting comparison of the law's treatment of subgroups within that larger class, such as all insurers but the MBAs, and the MBAs. Under our cases, if the legislature has classified all insurers but the MBAs in one group and the MBAs in another, those are the classifications we must examine. We are not free to break out groups that might be distinguishable if the legislature has not. *See Crowder v. Salt Lake County,* 552 P.2d 646, 647 (Utah 1976); *see also State v. Breed,* 111 Idaho 497, 725 P.2d 202, 205 (Ct.App.1986); *Aetna Life Ins. Co.*

*v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wash.2d 523, 527 n. 6, 520 P.2d 162, 165 n. 6 (1974) (en banc). To resolve this issue, a brief history of the premium income tax is necessary.

As early as 1907, the legislature passed laws regulating "insurance corporations." Utah Compiled Laws tit. 14, ch. 7, §§ 403–422 (1907). Those laws imposed a tax on "[e]very insurance company doing business in this state" of 1.5 percent of the gross premiums received, less any property tax paid to the state. *Id.* at §§ 419, 421. "Social," "benevolent," and "religious" organizations were excluded from these insurance laws, including the premium tax provision. *Id.* at § 418. We are unaware of whether any of the then-existing social, benevolent, or religious organizations offered insurance to any of their members at the time, although the specific exemption would suggest that this is a distinct possibility. The 1907 statute did not define "insurance corporations." This lack was remedied in 1909, when insurance corporations were defined to include "all corporations, associations, partnerships or individuals engaged as principals in the insurance business, *excepting fraternal and benevolent orders and societies.*" 1909 Utah Laws ch. 121, § 2 (emphasis added).

In 1909, the legislature authorized the creation of county mutual insurance compa-

---

**2.** There shall be paid to the state tax commission by every corporation subject to the provisions of this act a *tax of 2¼% of the total subscription income received* by it during the next preceding calendar year from contracts covering risks in this state less the amount of all subscription income returned or credited to subscribers on direct business in this state. Utah Code Ann. § 31–37–9(2) (Supp.1981) (emphasis added).

**3.** *Every insurance company engaged in the transaction of business in this state shall pay to the state tax commission, on or before March 31 in each year: (1) a tax of 2¼% of the total premium received by it during the next preceding calendar year from insurance covering property or risks located in this state,* other than workmen's compensation and occupational disease disability insurance premiums specified in subsection (3), and other than ocean marine as specified in subsection (2) hereof, less the amount of all premiums returned or credited to policyholders on direct business in this state and premiums received

for reinsurance of such property or risks and, less the amount of dividends, including premium reduction coupons maturing within said year, paid or credited to policyholders within this state or applied in abatement or reduction of premiums due during the calendar year next preceding, *and less premiums on policies which have been or will be issued by domestic benefit [MBAs], or co-operative benefit associations.*
Utah Code Ann. § 31–14–4(1) (Supp.1981) (emphasis added).
Technically, section 31–14–4(1) gives the MBAs a deduction rather than an exemption. But since the deduction eliminates the MBAs' liability for premium tax, it is *de facto* an exemption, and we will refer to it as such.

**4.** "Subscription income" for health service corporations, the term used in section 31–37–9(2), is equivalent to "premium income" for other insurance companies, and the remainder of this opinion will refer to both types of income as "premium income."

nies that could provide protection against losses occasioned by fire. 1909 Utah Laws ch. 95. In 1915, these county mutuals were exempted from the general statutes regulating insurance companies, including the provision imposing the 1.5 percent tax. Utah Compiled Laws title 19, ch. 11, § 1187 (1917). The insurance laws were recodified in 1933. At this time, county mutuals and fraternal benefit societies were each broken out and covered by their own specific provisions of title 43 of the 1933 Code, and each was explicitly excluded from the other provisions of the insurance laws, including that imposing the premium tax. Utah Rev. Stat. §§ 43–8–18, 43–9–4 (1933).

"Benefit associations" made their first appearance in the Code in 1935. At that time, the legislature required that they comply with the provisions of the newly enacted statute. 1935 Utah Laws ch. 41. It appears that these associations were not to be subjected to the premium tax then applicable to all insurance companies, and it also appears that the new benefit associations were defined so as to permit the fraternal or religious benefit associations that had been previously exempted from the insurance laws to continue business under this new form with the proviso that those societies and/or organizations paying sick or death benefits to members or their dependents would be exempt from provisions of the Act. 1935 Utah Laws ch. 41, § 18. During the same legislative session, the premium income tax on insurance companies was raised from 1.5 percent to 2.25 percent, where it remains today. 1935 Utah Laws ch. 40.

In 1941, the legislature provided for the creation of "cooperative life insurance associations." 1941 Utah Laws ch. 47. These associations appear not to have been subjected to the general premium tax applicable to insurance corporations. In 1943, the laws of Utah were recodified. At that time, insurance companies, benefit associations, and cooperatives were each covered by separate titles. *See* Utah Code Ann. tit. 43, §§ 3, 11, 12 (1943). All the insurance laws were recodified in 1947. At that time, the exemption from the premium tax enjoyed by "domestic benefit or cooperative benefit associations" was inserted in the section imposing the tax on other insurers. 1947 Utah Laws tit. 43, ch. 14, § 4(1). The name "benefit associations" was also changed to "mutual benefit associations." 1947 Utah Laws title 43, ch. 31.

In 1947, the legislature added chapter 30 to title 43. It applied to "non-profit hospital service plans" such as Blue Cross. This is the first time such plans appeared in the Code. These hospital service plans were excluded from the coverage of the insurance laws that contained the 2.25 percent premium tax. 1947 Utah Laws tit. 43, ch. 30.

In 1969, the insurance laws were again recodified. What were then termed health service corporations were brought under the jurisdiction of the state Commissioner of Insurance, and the 2.25 percent premium tax was imposed on them. At the same time, the legislature barred the entry of any new MBAs or cooperatives into the insurance field; however, existing companies of that type were grandfathered, and the grandfathered companies remained tax-exempt, as they had been since they were first recognized in the statutes. The reason for shifting health service corporations such as Blue Cross into the category of insurers subject to the premium tax appears to have been a desire to equalize what the legislature saw as competitive unfairness resulting from their previous tax-exempt status.[5]

---

5. In debate on the floor of the House of Representatives regarding the imposition of the 2.25 percent premium tax on Blue Cross and the other health service corporations, Representative Gunnell, the chair of the committee that recommended the legislation, said the committee had studied this issue for several years and "felt at that time that this bill that covers Blue Cross/Blue Shield should bring Blue Cross/Blue Shield under the same regulations and under the same taxing situation as other insurance companies in the State.... I think I state as chairman of the committee the feeling of that committee—that the Blue Cross/Blue Shield Insurance Company should be taxed equally, and that it would be absolutely fair in light of the competitive situation that exists in the insurance industry."

As this history reveals, there is a good deal of variety in the types of organizations offering insurance, and ways of organizing and operating insurers are constantly evolving. Over the years since 1907, when insurance companies were first explicitly recognized in the Utah statutes, the legislature has classified insurers and grouped them together in various ways at different times for purposes of regulation and taxation.[6] Since 1969, the legislature has grouped health service corporations and other insurance corporations together for purposes of imposing the 2.25 percent premium tax, and it has grouped mutual benefit associations and cooperative benefit associations together for the purposes of exempting them from the tax. Based on the legislature's very conscious decision in 1969 to group insurance corporations and health service corporations together for the purposes of the premium tax and to continue to exempt expressly MBAs and cooperatives from that tax, we conclude that we must accept those classifications for the purpose of analyzing the constitutionality of the premium tax. We therefore reject efforts by the State and Blue Cross to have us consider other groupings for comparison purposes, such as health service corporations and MBAs, or health service corporations alone. The relevant groupings for our purposes are insurance companies covered by section 31–14–4 and health service corporations covered by section 31–37–9, on the one hand, and MBAs and cooperative benefit associations, a subgroup of insurance companies, on the other (hereafter referred to collectively as "MBAs"[7]).

■ Having settled the question of the relevant classifications, we next move to the three-step analytical model used to determine compliance with the uniform operation of the laws provision of article I, section 24. *See* p. 637, *supra*. The first question is whether there is anything inherently unreasonable in the legislature's classifying all insurers together but then treating as a separate class those organized as MBAs. On its face, that distinction is not patently unreasonable. There might well be characteristics of companies organized as MBAs that would warrant treating them differently than other insurers. Indeed, the legislature has classified different insurers differently at various times for various regulatory or revenue purposes. Therefore, we cannot say that in the abstract, the classifications drawn by the statutes create a discrimination "with no rational basis." *Mountain Fuel Supply*, 752 P.2d at 890 (quoting *Mountain States Legal Found. v. Public Serv. Comm'n*, 636 P.2d 1047, 1055 (Utah 1981)). And the basis upon which the classification is made is certainly not proscribed. *See Mountain Fuel Supply*, 752 P.2d at 890.

The second issue under our analytical model is the legitimacy of the objectives pursued by the legislation. Here, the State advances two purposes. The first and predominant purpose of the premium income tax is to raise revenue for general governmental expenses. This is a legitimate purpose. *Mountain Fuel Supply*, 752 P.2d at 890. A second and somewhat subsidiary purpose suggested by the State for the inclusion in 1969 of health service corporations within the group of insurers subject to the premium tax is to equalize taxation of insurers who compete with each other. As for the exclusion of the MBAs from the tax, the State suggests that the legislature may have thought the "fraternal" nature of the MBAs warranted treating them differently than more commercially oriented insurers. This, too, is a legitimate legisla-

---

**6.** It is also noteworthy that a new form of what might broadly be termed health care insurance has emerged recently in the form of health maintenance organizations, or HMOs, and the legislature has chosen not to consider these insurance at all. They are not separately regulated, and they are not subject to the premium tax. The same is true of the "insurance" offered by motor clubs; they are not regulated, and their premium income is not taxed. *See* Utah Code Ann. § 31–42–31 (1974).

**7.** From our review of the record, we are unable to determine whether there are, in fact, any cooperative benefit associations. Certainly, none are part of this litigation. Therefore, for the purposes of this opinion, we will refer to those exempted from the premium tax as MBAs.

tive purpose.[8]

The third and most critical question is whether the legislature chose a permissible means to achieve its legitimate ends. According to Blue Cross, MBAs are in all significant respects operationally indistinguishable from other insurers and compete directly against them. Blue Cross also contends that it has lost business to the MBAs because of the price-distorting impact of the premium tax. Blue Cross submitted a conclusory affidavit in support of this latter proposition which stated that Blue Cross had been unsuccessful in gaining the health insurance business of certain institutions served by MBAs and that the premium tax exemption enjoyed by MBAs gave them a competitive pricing advantage, including Blue Cross. Given the lack of any significant differences between the MBAs and nonprofit health service corporations and the competitive burden the premium tax creates for Blue Cross when competing with the MBAs, Blue Cross contends that the MBAs' premium tax exemption constitutes a discrimination that is not reasonably related to any legitimate legislative end; therefore, it must be declared invalid and the whole premium tax scheme struck down.

Blue Cross dismisses the State's claim that in imposing the tax on health service corporations, the legislature was also attempting to remedy a perceived market place inequity—that Blue Cross had proven itself to be a very successful competitor in the health care insurance market, that its exemption from the premium income tax paid by other generally for-profit insurers had become unfair, and that treating MBAs differently by continuing their exemption was appropriate because their "fraternal" character distinguished them from the commercial insurers—by asserting that there is virtually no legislative history explaining why the MBAs' exemption was continued. On this basis, Blue Cross contends that there is no legitimate objective for the leg-

islation beyond revenue enhancement and, therefore, we must judge the segregation of MBAs and Blue Cross into two different classes against that purpose only.

■ In this approach to the issue, Blue Cross misperceives the applicable standard of review when addressing purely economic enactments. As stated earlier, in determining whether the classifications the legislature has used in such enactments are reasonably related to a legitimate legislative purpose, we are not limited to considering those purposes that can be plainly shown to have been held by some or all legislators. We will sustain a classification if we can reasonably conceive of facts "which would justify the distinctions or differences in state policy [expressed by the challenged legislation] as between different persons." *Baker*, 607 P.2d at 244 (citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)). We do not "accept any conceivable reason for the legislation.... Rather, we judge such enactments on the basis of reasonable or actual legislative purposes." *Malan*, 693 P.2d at 671 n. 14. But we do not require any exact proof of those purposes; it is enough that they may be reasonably imputed to the legislative body.

With this standard in mind, we move on to consider the relationship of the means used to a legitimate end. From the legislative history cited to the trial court, it appears obvious that the health service corporations were subjected to the premium tax in 1969 because the legislature thought it unfair to exempt them from a tax imposed on their competitors in the marketplace. There is nothing in the legislative history, however, that helps explain why the MBAs' exemption was continued. It is in the history of the premium tax that we find a probable reason for treating the MBAs differently: the legislature considered MBAs, unlike health service corporations, to be different in character than the run-of-the-

8. Blue Cross strenuously objects that this supposed purpose was raised for the first time on appeal. Our review of the record indicates that this is not the case. The issue was raised before the trial court, and extensive reference to the legislative history of the premium tax scheme was submitted in support of the State's contention. Blue Cross certainly cannot contend that it has been surprised by the assertion of this claim again on appeal.

mill commercial insurer. This legislative judgment about the character of those exempted from the premium tax has a long history, dating back to the initial insurance legislation in 1907. From then on, what have variously been labeled fraternal, cooperative, religious, or mutual benefit associations that offer insurance to their members or adherents have been exempt from the premium tax and, at various times, have been subjected to entirely separate schemes of regulation. The question for us is whether the judgment that MBAs are sufficiently different to be eligible for different tax treatment is sustainable.

In an effort to find a reasonable basis for the legislature's separate classification of MBAs for purposes of the premium tax, we have reviewed their organizational structure and mode of operation, as they are explained in the statutes and record. In summary, we can say that while health insurance in Utah is offered by a variety of types of companies, including stock insurers,[9] mutual insurers,[10] reciprocal insurers,[11] mutual benefit associations,[12] and health service corporations,[13] and each is organized and functions in a slightly different manner, there is little inherent in any of these forms of organization that is of much significance when it comes to determining what sorts of products they can or do offer in the insurance marketplace. And whatever distinctions may exist in organization, function, or product offered, the legislature did not find those distinctions significant for tax classification purposes. This is evident because MBAs share many characteristics both with health service corporations and with others of the insurers mentioned above, yet the legislature chose to treat MBAs differently for purposes of the premium tax.

The only characteristic that seems to set MBAs apart from the insurers taxed is that of the six MBAs in Utah, most are nonprofit and restrict their business to issuing policies only to employees of a single company or to members of a church or association to which the MBA is captive.[14] There is nothing in the statutes under which the MBAs are organized that requires them to so restrict their business or prevents them from being operated as for-profit corporations. However, all but two have so restricted themselves with respect to the sources of their business, and only one MBA is operated as a for-profit corporation. This raises two questions: first, can the legislature treat all insurers sharing these characteristics as a separate class for purposes of the premium tax; second, if the class includes some insurers that do not share those characteristics, does that fact invalidate the classification measure? We treat these questions separately.

The first issue, whether these characteristics are sufficient to justify the legislature's treating those sharing them as a

---

9. Utah Code Ann. tit. 31, ch. 8 (1974).

10. Utah Code Ann. tit. 31, ch. 9 (1974 & Supp. 1981).

11. Utah Code Ann. tit. 31, ch. 10 (1974 & Supp. 1981).

12. Utah Code Ann. tit. 31, ch. 31 (1966).

13. Utah Code Ann. tit. 31, ch. 37 (1974 & Supp. 1981).

14. Deseret Mutual Benefit Association has forty-one policyholders, most of which are affiliates of the Corporation of the President of the Church of Jesus Christ of Latter–Day Saints. Deseret Mutual does not use a sales force and does not solicit insurance business from the general public.

Associated American Mutual Life Insurance Company has only three policyholders—Deseret Mutual Benefit Association, Intermountain Health Care (formerly owned by the L.D.S. Church), and the Corporation of the President of the Church of Jesus Christ of Latter–Day Saints. Associated American provides coverage only for employees of Intermountain Health Care.

Electric Mutual Benefit Association provides group hospital and surgical insurance and accidental death insurance to employees of Utah Power & Light Company.

Educators Mutual Insurance Association provides insurance to members of the Utah Education Association and others who are engaged in certain educational activities in Utah.

Gem State Mutual offers insurance to anyone in Utah, but primarily sells group policies to small businesses.

Allied Mutual Assurance Association is a for-profit corporation that offers insurance to anyone in Utah, but it does not offer health or accident insurance.

distinct class of insurers for purposes of the premium tax, we answer in the positive. We see nothing illegitimate in treating insurers that can be characterized as adjuncts of nonprofit, religious, cooperative, or benevolent organizations as different than what might be characterized as commercial insurers. By exempting MBAs from the premium tax, the legislature may have been expressing its judgment that entities of this type are not comparable to commercial insurers that compete in the open market and should not therefore be burdened by the premium tax. That judgment does not appear to be without rational foundation.

Blue Cross notes that the law under which these insurers are organized does not require MBAs to have the characteristics that we conclude could have motivated the legislature to treat them separately. The relevant question is not whether the law requires those characteristics, but whether in fact they share those characteristics. If they all did, we would have no further question about whether the exemption is reasonably related to a legitimate legislative purpose; however, they do not. Gem State Mutual and Allied Mutual Assurance do not have the same captive affiliation with a specific group that characterizes all the rest of the MBAs; both these companies sell to anyone in Utah, and Gem State sells health insurance, presumably in direct competition with Blue Cross and other health insurers. We cannot conceive of any reason why such insurers would be treated differently for purposes of the premium tax. To this extent, then, the legislature, in exempting all entities organized as MBAs from the premium tax, has used a classification that imperfectly effects its purposes.

This gives rise to the second issue posed above: if the class includes some insurers that do not share the characteristics that could be legitimately used to define the class, does that fact invalidate the classification measure? We think that it does not.

The explanation for this conclusion requires that we return to the standard governing review of challenges under the uniform operation of the laws provision of article I, section 24 to the constitutionality of legislation that is purely economic. As noted earlier, we accord the legislature broad deference when reviewing the reasonableness of the relationship between the classifications it uses and legitimate legislative purposes it seeks to achieve. However, the analytical model spelled out above does not explicitly address the question of what we do when faced with what we conclude is an imperfect classification, even after we accord the legislative act every presumption. The answer lies in an examination of the impact of the misclassification.

 There is nothing inherent in the article I, section 24 test as it was stated in *Malan* and our other decisions based on equal protection or uniform operation of the laws principles, such as *Allen v. Intermountain Health Care, Inc.*, 635 P.2d 30 (Utah 1981), and *Redwood Gym v. Salt Lake County Comm'n*, 624 P.2d 1138 (Utah 1981), that expressly requires us, in determining the constitutionality of an enactment, to take into account the impact of the legislative classification under attack on those classified. However, it seems clear that the impact of a measure can be relevant to determining whether the legislative body has exceeded the bounds of the broad discretion it has in fashioning purely economic legislation.

For example, in *Mountain Fuel Supply*, appellant Mountain Fuel contended that Salt Lake City had created an arbitrary classification when it singled out for the imposition of a franchise tax, set at four percent of gross receipts, all public utilities supplying natural gas, electricity, and telephone service and all others supplying natural gas, electricity, and telephone service in competition with the public utilities.[15] Mountain Fuel contended that the classifi-

---

15. The Salt Lake City ordinance under attack taxed equally all suppliers of gas, electricity, and telephone services. It was not limited in its reach to public utilities. *Mountain Fuel Supply*

*Co. v. Salt Lake City Corp.*, 752 P.2d 884, 886 & n. 1 (Utah 1988). *But see* opinion of Howe, J., concurring, 752 P.2d at 891.

cation was invalid because it did not treat equally all those similarly situated; specifically, the City did not impose the tax on those who sold heating fuels other than gas and electricity in direct competition with those taxed. Finally, Mountain Fuel contended that as a result of this tax, its ability to compete for certain customers, such as those able to switch from coal to gas with ease, was severely hampered.

The Court rejected Mountain Fuel's challenge to the ordinance. In so doing, we accepted as fact the claim that those subjected to the tax, including both utilities and nonutilities, were competitively disadvantaged to some degree because of the tax. 752 P.2d at 891. We also implicitly accepted as fact the contention that natural gas and electricity competed with other fuels in the heating fuel market. *Id.* But we determined that the question was not whether Salt Lake City had drawn perfectly the boundaries of the class of persons to be taxed; rather, the question was whether the City had drawn them in a permissible fashion. The permissibility of the classification was determined by balancing the justifications advanced by the City for excluding those who might logically have been included in the class against the harm allegedly suffered by those included as a result of the exclusion of their competitors. *Id.* We concluded that Mountain Fuel had not shown that the competitive disadvantage imposed on those taxed as a result of the arguably misdrawn class lines was sufficiently great, given the effectiveness of the tax in accomplishing the City's aims and the administrative efficiencies realized by not including in the taxed class those providing heating fuels other than natural gas and electricity, to warrant a finding that the burden resulting from the ordinance was "unreasonable" or "unjustifiable." *Id.*[16]

It is important to note that in evaluating the justifications for imposing the tax on suppliers of natural gas, electricity, and telephone service, the Court gave wide latitude to the City in demonstrating that the classification boundaries it drew were reasonably related to its revenue and tax-spreading objectives. Although the justifications for not taxing suppliers of alternative heating fuels focused on the ease of collecting the tax from public utilities and their ability to pass the tax on to customers, the fact remains that the tax was also levied on small-scale, non-utility suppliers of those same commodities and services. The administrative ease and efficiency claims advanced by the City to distinguish the public utilities from the suppliers of alternative fuels arguably did not apply when the non-utility suppliers who were taxed were compared with the alternative fuel suppliers who were not. *See* 752 P.2d at 891.

At the margins, then, the operation of the City's classification scheme might not have stood the test of its justifications. Some might have been excluded who could logically have been included and vice versa. However, the Court still affirmed the validity of the City's ordinance because, on the whole, after considering the burdens it imposed on those taxed, it appeared to be a reasonable attempt to achieve the legitimate government ends.

In so holding, we demonstrated the operation of the principle that in the area of purely economic legislation, and especially taxation, we do not require perfection. This principle was well stated in *Baker v. Matheson*, 607 P.2d 233 (Utah 1979):

> Legislative enactments that are basically economic in nature rarely affect all persons equally. Such enactments require classifications which necessarily reflect legislative judgments which accord various weights to various shadings of differences in human affairs. Razor-thin distinctions which are entirely devoid of some arbitrariness are rarely, if ever, possible. The rationality of the classifications is a matter of degree. If courts were to insist upon logical precision in creating classifications not consistent with the nature of the problem to be

---

**16.** For another case reflecting the examination of the burdens imposed by a tax in considering the reasonableness of the classification scheme defining those subject to it, see *Continental Bank & Trust Co. v. Farmington City*, 599 P.2d 1242 (Utah 1979).

addressed, legislative power would be seriously crippled. As Justice Holmes observed, "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931).

607 P.2d at 243; *see Recent Developments, Uniform Operation of Economic Regulations*, 1989 Utah L.Rev. 143, 307.

Returning to the present case, the question is whether the legislature acted impermissibly when it used a classification—MBAs—to achieve its objective of excluding insurers that can be characterized as adjuncts of nonprofit, religious, cooperative, or benevolent organizations from the premium tax when that classification is over-inclusive in that it exempts not only such organizations, but also two insurers that are apparently indistinguishable from those taxed. As noted, the classification used in *Mountain Fuel* was also over-inclusive. It taxed nonutility vendors that did not fit the justifications offered for the classification and that were presumably disadvantaged by the tax when competing against sellers of alternative fuels. Yet we upheld the classification, inasmuch as there had been no showing that the competitive burden imposed was unreasonable in light of the reasons offered in support of the classification used in imposing the franchise tax.

Similar logic applies in this case. Blue Cross submitted a conclusory affidavit to the trial court suggesting that it had been unable to secure contracts for insurance from some customers who had insured through MBAs. However, Blue Cross did not show that this business would have gone to it or to some other commercial insurer but for the premium tax, nor did it demonstrate that any disadvantage which resulted from the premium tax that it or the other insurers suffered when competing with MBAs was substantial or caused Blue Cross or the other insurers any financial hardship. The legislature is not to be denied an "effective means of raising needed revenues unless that means imposes an unreasonable burden on the affected parties." *Mountain Fuel*, 752 P.2d at 891.

In the present case, Blue Cross failed to show that it or any other insurer incurred any burden. Therefore, even though we cannot conceive of any reason for exempting two MBAs from the premium tax, that misclassification of insurers resulting from the measure is not sufficient to warrant striking down the tax.

For the foregoing reasons, we conclude that the challenge to the premium tax under article I, section 24 must be rejected. Since we reject that claim under the Utah Constitution, we also reject the challenge made under the equal protection clause of the fourteenth amendment to the United States Constitution. *Mountain Fuel*, 752 P.2d at 890.

 The next issue is Blue Cross's challenge to the premium tax under article VI, section 26 of the Utah Constitution. That provision states: "No private or special law shall be enacted where a general law can be applicable." Utah Const. art. VI, § 26. Our cases make it clear that a special law is a law that classifies its objects unreasonably, as by selecting from a general class particular persons, places, or things for the purpose of conferring privileges or imposing burdens. *See, e.g., Hulbert v. State*, 607 P.2d 1217, 1223–24 (Utah 1980); *Utah Farm Bureau Ins. Co. v. Utah Ins. Guar. Ass'n*, 564 P.2d 751, 754 (Utah 1977). Although there may be some differences between the reach of article I, section 24 and article VI, section 26, our cases to date have, in essence, viewed the special laws ban to be the flip side of the uniform operation of the laws command. *See State v. Bishop*, 717 P.2d 261, 265 (Utah 1986). If a law satisfies the requirement of article I, section 24, that all laws of "a general nature shall have uniform operation," it will not violate article VI, section 26.

In the present case, we have found that sections 31–14–4(1) and 31–37–9(2) operate to validly impose a premium tax on insurers, except for MBAs. As such, these statutes constitute general laws. And we have found that they do not offend the uniform operation of the laws requirement of article I, section 24. We therefore conclude that

they do not violate the special laws ban of article VI, section 26.

For the reasons stated above, we affirm the judgment of the trial court.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.