DOIT, INC., et al., Plaintiffs and Appellants,

*v.*

TOUCHE, ROSS & CO., et al., Defendants and Appellees.

No. 930512.

Supreme Court of Utah.

Aug. 2, 1996.

Rehearing Denied Nov. 21, 1996.

---

George M. Haley, Robert L. Stolebarger, Greggory J. Savage, Salt Lake City, and Malcolm A. Misuraca, San Francisco, Cal., for plaintiffs.

William Downes, Dennis V. Haslam, Salt Lake City, for Larry H. Miller.

David E. Bean, Layton, for Merrill Bean.

Gary F. Bendinger, Milo Steven Marsden, Catherine L. Brabson, Wesley D. Felix, Salt Lake City, for Pete Marwick; Deloitte, Haskins & Sells; Touche, Ross & Co.; Peat, Marwick, Main & Co.

Edwin C. Barnes, Rodney G. Snow, Stephen B. Doxey, Salt Lake City, for Coopers and Lybrand.

Glen E. Davies, David W. Scofield, Salt Lake City, for Paul Frampton.

Thomas L. Kay, Mark O. Morris, Paul D. Newman, Salt Lake City, for Roy B. Moore, P.C. Moore, Sessions & Moore.

Jan Graham, Atty. Gen., Reed M. Stringham, Bryce H. Pettey, Asst. Attys. Gen., Salt Lake City, for State of Utah and Commissioner of Financial Institutions.

DURHAM, Justice:

DOIT, Inc., a Utah nonprofit corporation organized to represent the interests of the depositors of Utah's failed thrift institutions, and numerous other plaintiffs[1] appeal from the trial court's entry of summary judgment dismissing the depositor class action and the receiver/liquidator actions against defendants.[2] We reverse.

 In reviewing the trial court's order granting summary judgment,[3] we consider

---

1. The other plaintiffs, while too numerous to mention by name, include a large number of individual depositors, several thrift and loan associations, the Industrial Loan Guaranty Corporation, the Commissioner of the Utah Department of Financial Institutions, the State of Utah, and its insurance carrier, California Union Insurance Company.

2. The defendants on appeal are Touche, Ross & Co.; Peat, Marwick, Main & Co.; Deloitte, Haskins & Sells; Coopers & Lybrand; Roy B. Moore; Merrill Bean; Paul Frampton; and Larry H. Miller.

3. Initially, we note that although the trial court's order purported to grant defendants' motions to dismiss pursuant to Utah Rule of Civil Procedure 12(b)(6), all of the memoranda in support of and in opposition to the motions to dismiss were accompanied by affidavits and other materials outside the pleadings. When affidavits or other evidence is presented in conjunction with a motion to dismiss under rule 12(b)(6) and the court does not exclude them, the motion is generally treated as a motion for summary judgment pursuant to Utah Rule of Civil Procedure 56. *See* Utah R.Civ.P. 12(b), 56(c); *World Peace Movement v. Newspaper Agency Corp.*, 879 P.2d 253, 256 n. 2 (Utah 1994); *Warren v. Provo City Corp.*, 838 P.2d 1125, 1127 n. 2 (Utah 1992); *Johnson*

the evidence and all inferences that may be reasonably drawn therefrom in the light most favorable to the losing parties. *Thayne v. Beneficial Utah, Inc.,* 874 P.2d 120, 124 (Utah 1994).

## I. FACTS

This case arises out of the collapse of the state-regulated thrift industry in the state of Utah. On July 31, 1986, the Utah Department of Financial Institutions (DFI) issued an order seizing the Industrial Loan Guaranty Corporation (ILGC)[4] and seven of the ILGC's member thrifts.[5] The DFI's order also mandated a freeze of all activity—except for minimal scheduled withdrawals—in the seized thrifts. On the same day, the DFI issued a "White Paper on the State of Utah's Response to the Plight of the Thrift and Loan Industry on July 31, 1986." The White Paper disclosed the ILGC's insolvency and suggested that the financial condition of the ILGC and its member thrifts had been concealed from depositors for years.

Consequently, on July 20, 1987, numerous depositors of the failed thrifts initiated this class action by filing a complaint against the State, the DFI, and the DFI Commissioner, George Sutton.[6] On December 7, 1987, the depositors filed a motion to amend the original complaint, along with a proposed amended complaint, seeking to name numerous additional defendants, including Larry H. Miller and three hundred "John Does" among whom were the unknown officers, managing personnel, and professional advisors of the ILGC and five of the failed thrifts. The trial court *sua sponte* denied the motion to amend but granted the depositors leave to file another amended complaint.

The depositors filed a second amended complaint on February 23, 1988. The trial court, however, dismissed this complaint without prejudice for failure to comply with Utah Rule of Civil Procedure 9(b), which requires that certain causes of action be pleaded with particularity. The trial court also ordered that the failed thrifts be realigned as plaintiffs rather than as defendants in the action.

Before the second amended complaint was dismissed, the State and its insurance carrier, California Union Insurance Company (Cal Union), reached a settlement with the depositors in which the State and Cal Union agreed to pay the depositors a total of forty-four million dollars. The settlement culminated in the Thrifts Settlement Financing Act, Utah Code Ann. §§ 7–21–1 to –10 (TSFA), which the Utah Legislature passed on October 7, 1988. The TSFA detailed the intricacies of the settlement agreement and how the settlement was to be funded.[7] It required that the depositors release the State, the DFI commissioner, the settling insurance carriers, and the officers and trustees of the ILGC from all liability. Utah Code Ann. § 7–21–5 (amended 1995). The TSFA also required the State and Cal Union to join in the depositor class action either as plaintiffs or under any other designation which the trial court determined adequately represented the State and Cal Union's interests and

*v. Morton Thiokol, Inc.,* 818 P.2d 997, 999 (Utah 1991). This treatment is especially proper in the instant case where all parties submitted extraneous materials and neither plaintiffs nor defendants are prejudiced. Accordingly, defendants' motions and the trial court's order are properly viewed as summary judgment proceedings.

4. The ILGC was a private nonprofit corporation intended to guarantee thrift deposits until those deposits became federally insured. *See* Utah Code Ann. § 7–8a–2 (repealed 1994).

5. The DFI seized Western Heritage Thrift & Loan (Western Heritage), Interlake Thrift & Loan (Interlake), Copper State Thrift & Loan (Copper State), Charter Thrift & Loan (Charter), Commerce Financial, Horizon Thrift & Loan, and St. George Thrift & Loan.

6. In their initial complaint, the depositors sought a declaration that (1) the class claim filed against the State was valid under the Utah Governmental Immunity Act and (2) the individual claims were valid under the same act. Additionally, plaintiffs requested an extension of time in which to file further individual claims on behalf of the depositor class.

7. The TSFA provided that the State's general fund would contribute twenty-five million dollars to the settlement, with Cal Union supplying the remaining nineteen million dollars. Utah Code Ann. § 7–21–4(3).

standing in the lawsuit. Utah Code Ann. § 7–21–4(5)(a).

In addition, the TSFA mandated that any further claims against other potentially responsible parties which arose out of the thrift failures could not be litigated unless a "Thrifts Panel" (the panel) first authorized them. Utah Code Ann. § 7–21–4(5)(e). The panel would have "binding power to authorize or refuse to authorize any litigation in these claims, whether arising from the interests of the depositor class, the state, or the settling carriers." Utah Code Ann. § 7–21–7(1). This included all claims "arising from or related to the thrift institutions, the guaranty corporation, or their insolvencies, regardless of whether or when the claims or actions are filed or asserted," or "whether . . . the state or depositors are parties." Utah Code Ann. § 7–21–4(5).

By July 31, 1989, the panel had not been assembled, and thus, plaintiffs' claims had not been authorized for litigation. Nonetheless, plaintiffs filed a third amended complaint. In this complaint, plaintiffs acknowledged that they were required to comply with the provisions of the TSFA before they could litigate their claims. In addition, plaintiffs attempted to add Touche, Ross & Co. (Touche); Peat, Marwick, Main & Co. (Peat); Deloitte, Haskins & Sells (Deloitte); and Coopers & Lybrand (C & L) as defendants, replacing prior fictitious designations. However, the complaint was never served on any defendant and thus was deemed dismissed pursuant to Utah Rule Civil Procedure 4(b) (1989).[8]

Subsequently, in December 1990, the panel was assembled. It required that all proposed claims be filed no later than February 25, 1991. As part of this process, plaintiffs submitted a "proposed form of complaint," seeking authorization of seventy-five causes of action. On November 7 and 8, the panel held oral argument to determine which claims to authorize for litigation. The TSFA required that the panel, in making its determination, consider, among other factors, (1) whether the claims appeared to be grounded in fact, sanctioned by existing law, or supported by a good faith argument for the extension, modification, or reversal of existing law, and (2) whether equitable considerations warranted continued litigation. Utah Code Ann. § 7–21–7(3)(a)–(b). On February 10, 1992, the panel issued a report. It approved most claims but barred litigation of "[c]laims alleging liability premised on audit opinions that were either adverse or 'going concern' opinions"[9] on the ground that adverse or "going concern" audit opinions should have put the ILGC and the State on notice of problems at the thrifts. The panel further refused to authorize litigation of claims premised on an alleged duty of an accountant to be a "whistle blower" to the depositors or the public.

On May 19, 1992, following the issuance of the panel report, plaintiffs, including for the first time the ILGC, filed their fourth amended complaint, alleging sixty-two separate causes of action against defendants Touche, Peat, Deloitte, C & L, and Miller. Moreover, it was the first complaint to specifically name Roy B. Moore, Merrill Bean, and Paul Frampton as defendants. The complaint alleged claims sounding in negligence, civil conspiracy, state securities violations, and fraud. All defendants except Bean and Frampton filed motions to dismiss in October 1992. These motions asserted that plaintiffs' claims were barred by statutes of limitations, laches, lack of standing on the part of the State and Cal Union, and lack of panel authorization.

The trial court heard defendants' motions on April 1, 1993, and issued its formal memorandum decision and order on August 31,

---

**8.** At the time plaintiffs' filed their third amended complaint, rule 4(b) provided in pertinent part, "The summons must be served within one year after the filing of the complaint or the action will be deemed dismissed. . . ." Utah R.Civ.P. 4(b) (1989). Rule 4(b) has since been amended to state that if the summons is not served within 120 days of the filing of the complaint, "the action shall be dismissed, without prejudice on application of any party or upon the court's own initiative." Utah R.Civ.P. 4(b) (1995).

**9.** A going concern opinion must be issued when an independent auditor discovers circumstances which may prevent an entity from continuing its business. Kay & Searfoss, *Handbook of Accounting and Auditing* 11–16 (2d ed. 1989).

1993. The trial court dismissed plaintiffs' fourth amended complaint with prejudice, ruling that all applicable statutes of limitations had expired.[10] Additionally, the court noted that supplemental grounds existed for dismissing some of plaintiffs' claims, namely, laches, standing, and lack of panel authorization.

Plaintiffs appeal, arguing that the trial court erred in determining that (1) their claims were time-barred under all applicable statutes of limitations, (2) some claims were barred by laches, (3) the State and Cal Union lacked standing to assert claims against these defendants, and (4) certain claims were barred because (a) plaintiffs failed to submit the claims to the panel for authorization as the TSFA required, or (b) if the claims were submitted, the panel specifically barred litigation of these claims.

## II. STANDARD OF REVIEW

■ Summary judgment is appropriate in cases in which there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). "[I]n reviewing a grant of summary judgment, we analyze the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). Because the determination of whether summary judgment is appropriate presents a question of law, we accord no deference to the trial court's decision and instead review it for correctness. *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 636 (Utah 1989).

## III. CLAIMS AGAINST ACCOUNTANT DEFENDANTS

■ Plaintiffs allege several causes of action against defendants Touche, Peat, Deloitte, and C & L (collectively, accountant defendants). Plaintiffs specifically allege that the accountant defendants' actions amounted to negligence, negligent misrepresentation, gross negligence and/or recklessness, breach of contract, breach of warranty, securities violations, deceit, constructive fraud, and civil conspiracy.[11] Plaintiffs' claims stem from the accountant defendants' actions in preparing audit opinions on the financial condition of the ILGC and the thrifts.[12] The main thrust of plaintiffs' allegations is that the accountant defendants (1) failed to exercise due professional care in performing and issuing audit reports, (2) permitted the ILGC and the thrifts to issue false and misleading financial statements upon which the depositors relied, and (3) intentionally aided the ILGC and the thrifts in defrauding the depositors. Plaintiffs maintain that as a result of this conduct, the true financial condition of the various entities was not disclosed and that this lack of disclosure and the ensuing failure of the ILGC and the thrifts caused them significant damage.

The trial court, however, did not reach the merits of these arguments, instead entering summary judgment in favor of defendants on multiple grounds. Plaintiffs now appeal, ar-

10. In 1992, the receivers of the failed thrifts, who had initiated separate lawsuits, consolidated their actions with the depositors' suit. Accordingly, the trial court's final order dismissing all of plaintiffs' claims with prejudice included all claims in the consolidated actions. The trial court's order also dismissed all claims against defendants Bean and Frampton. Although these two defendants did not move to dismiss, they notified the court that they had asserted the arguments made by the moving defendants by way of affirmative defenses. Consequently, the trial court granted their request for dismissal.

11. Plaintiffs additionally allege a cause of action titled "prima facie tort" against all accountant defendants. However, plaintiffs have not supplied, and we have been unable to find, any legal precedent which indicates that such a cause of action exists in Utah. The case law from jurisdictions which recognize this cause of action suggests that the doctrine of prima facie tort is based on (1) an intentional *lawful* act done by a party with the intent to cause injury to another, (2) an injury to such other, and (3) an absence of sufficient justification for the act charged. *See, e.g., Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo.Ct.App.1980). In the case at bar, plaintiffs' prima facie tort claims are solely based on defendants allegedly *unlawful* conduct. Thus, even if we were to recognize that such a cause of action exists in Utah, plaintiffs have failed to properly plead it.

12. Touche was the independent auditor for the ILGC, Peat for Western Heritage, Deloitte for Interlake, and C & L for Copper State.

guing that (1) their fourth amended complaint was timely filed because (a) the TSFA tolled the applicable statutes of limitations from the time the panel was established until the date the panel issued its report or (b) the complaint relates back to prior complaints, (2) there is no factual support to uphold a finding of laches, (3) the TSFA expressly granted the State and Cal Union standing to join this suit and prosecute claims against these defendants, and (4) all of their claims were presented to and approved by the panel.

### A. Statutes of Limitations

Plaintiffs argue that the trial court erred in determining that the applicable statutes of limitations barred all of their claims. Specifically, plaintiffs allege that the trial court committed error in (1) utilizing an accrual date of July 31, 1986, (2) failing to toll the limitations periods pursuant to Utah Code Ann. § 78–12–41, and (3) failing to relate the fourth amended complaint back to prior complaints.

### 1. Accrual Date

Three statutes of limitations are applicable to plaintiffs' claims against the accountant defendants. Plaintiffs' negligence, negligent misrepresentation, gross negligence and/or recklessness, breach of contract, and breach of warranty claims (collectively, plaintiffs' tort claims), as well as plaintiffs' civil conspiracy claim, are all subject to the general four-year limitations period pursuant to Utah Code Ann. § 78–12–25(3).[13] Second, plaintiffs' deceit and constructive fraud claims are governed by a three-year statute of limitations pursuant to

Utah Code Ann. § 78–12–26(3). Finally, plaintiffs' state securities claims were required to be brought "before the expiration of four years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever expires first." Utah Code Ann. § 61–1–22(7)(a).

The trial court reasoned that plaintiffs' various causes of action "accrued at the latest on July 31, 1986, when the DFI seized the thrifts and the ILGC and the depositors were notified that they no longer had free access to their deposits." Because plaintiffs did not name these accountants as defendants until their fourth amended complaint, filed May 19, 1992, nearly two years after the four-year limitations period expired, the trial court found that plaintiffs' claims were time-barred. While plaintiffs concede the facts upon which the trial court relied in making its decision, they argue that their claims did not accrue "until it became apparent that they would not receive the return of their deposits." Specifically, they maintain that the earliest possible accrual date was March 12, 1987, the date on which the State acknowledged "that the day to rehabilitate the thrifts and the ILGC was over, and the day of liquidation was at hand."

Because we hold that the passage of the TSFA tolled the applicable limitations periods from October 7, 1988 until February 10, 1992, the date the panel issued its report authorizing plaintiffs' claims, we need not decide whether the trial court correctly determined that plaintiffs' claims accrued on July 31, 1986.[14] Even assuming the trial court was correct, plaintiffs still had a mini-

---

13. The trial court found that plaintiffs' breach of contract and breach of warranty claims were "simply rephrased negligence claims," and thus "they too are subject to a four year limitations period." We agree. "The general rule is that a plaintiff will not be permitted to characterize a tort action as one in contract in order to avoid the bar of the statute of limitations." *Malone v. University of Kansas Medical Ctr.*, 220 Kan. 371, 552 P.2d 885, 889 (1976). Plaintiffs here do not claim that the accountant defendants failed to perform their contracts; the audits were performed, completed, and delivered. The wrongs plaintiffs allege are that the accountants failed to perform those audits in accordance with the

duties imposed upon them, not by the specific terms of their contracts, but under Utah law and the professional standards of the accounting profession. In other words, plaintiffs simply claim that defendants failed to exercise the reasonable care which the law requires. Accordingly, plaintiffs' claims sound in tort, not in contract, and are subject to a four-year limitations period.

14. Thus, for purposes of this appeal we assume without holding that plaintiffs' claims governed by the three- and four-year statutes of limitations accrued on July 31, 1986.

mum of ten months to file these claims following the issuance of the panel's report on February 10, 1992. Plaintiffs filed their fourth amended complaint on May 19, 1992, less than four months after panel approval, and it was clearly timely.

We must, however, determine whether plaintiffs' state securities claims, carrying a two-year statute of limitations, accrued on July 31, 1986, as the trial court ruled. If so, the statute of limitations would have run prior to the passage of the TSFA, and our holding that the TSFA tolled the statutes of limitations would not apply.

Under Utah law, a statute of limitations begins to run against a party when the cause of action accrues. Utah Code Ann. § 78–12–1; *Retherford v. AT & T Communications,* 844 P.2d 949, 975 (Utah 1992). As a general rule, a cause of action accrues when a plaintiff could have first filed and prosecuted an action to successful completion. *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981); *accord Brigham Young Univ. v. Paulsen Constr. Co.,* 744 P.2d 1370, 1373 (Utah 1987); *Becton Dickinson & Co. v. Reese,* 668 P.2d 1254, 1257 (Utah 1983). Once a claim accrues, it may not be maintained unless it is commenced within the limitations period prescribed by the applicable statute of limitations. *See* Utah Code Ann. § 78–12–1.

Plaintiffs' state securities claims had to have been brought "before the expiration of four years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever expires first." Utah Code Ann. § 61–1–22(7)(a). Thus, this section provides for a four-year statute of repose as well as a two-year statute of limitations. Accordingly, plaintiffs' claims will be barred if either time period expired before they filed their fourth amended complaint.

Plaintiffs' state securities claims are based on the audit reports that the accountants issued for the fiscal years 1982, 1983, 1984, and 1985. Specifically, plaintiffs claim that the act or transaction constituting the state securities violation was the accountant defendants' dissemination of false and misleading information on the financial status of the ILGC and the thrifts to the public. The last alleged violation, therefore, occurred when the fiscal year 1985 audit reports were issued. Thus, we agree with the trial court's finding that plaintiffs discovered the facts constituting the alleged state securities violations by July 31, 1986, at the latest and had until July 31, 1988, to file these claims. However, plaintiffs did not assert any state securities claims until they filed their fourth amended complaint on May 19, 1992.

As noted, because the legislature did not pass the TSFA until October 7, 1988, more than two months after the expiration of the two-year limitations period applicable to plaintiffs' state securities claims, our holding that the passage of the TSFA tolled the statutes of limitations is not applicable to those claims. Likewise, plaintiffs' attempt to avoid the statute of limitations bar by contending that their fourth amended complaint relates back to prior complaints must fail as to the state securities claims. Plaintiffs did not allege such claims until filing their fourth amended complaint on May 19, 1992, nearly four years after the running of the statute of limitations. Thus, we agree with the trial court's conclusion that the two-year statute of limitations bars plaintiffs' state securities claims.

### 2. Tolling

Plaintiffs contend that the trial court erred in refusing to toll the applicable limitations periods pursuant to Utah Code Ann. § 78–12–41.[15] According to plaintiffs, the statutes of limitations should be tolled from the time of the TSFA's enactment until the date the panel issued its report, specifically from October 7, 1988, to February 10, 1992. We agree.

We begin our analysis by examining the language of the TSFA. "[T]his Court's primary responsibility in construing

---

**15.** Utah Code Ann. § 78–12–41 states:

When the commencement of an action is stayed by injunction or a statutory prohibition the time of the continuance of the injunction or prohibition is not part of the time limited for the commencement of the action.

legislative enactments is to give effect to the Legislature's underlying intent." *West Jordan v. Morrison,* 656 P.2d 445, 446 (Utah 1982). Generally, the best indication of that intent is the statute's plain language. *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1038 (Utah 1989). Thus, we will interpret a statute according to its plain language unless such a reading is unreasonably confused, inoperable, or in blatant contravention of the express purpose of the statute. *West Jordan,* 656 P.2d at 446.

The legislature created the TSFA to effectuate a forty-four million dollar settlement of plaintiffs' claims against the State and the ILGC. As part of the settlement, the TSFA sought to facilitate the resolution of plaintiffs' claims against the instant defendants to recoup losses which the settlement did not cover. In particular, under the TSFA, plaintiffs' claims for relief could not be litigated in a court of law unless and until they received panel approval. Section 7–21–7 states:

> (1) There is created a Thrifts Panel to screen all claims for recovery under Subsection 7–21–4(5). *This panel shall have binding power to authorize or refuse to authorize any litigation in these claims, whether arising from the interests of the depositor class, the state, or the settling carriers.*

(Emphasis added.) Thus, under the terms of the TSFA, plaintiffs' claims could not be litigated from the effective date of the TSFA until the panel completed its task of specifying what claims, if any, could be pursued in court. That was not done until after the statutes of limitations ran on plaintiffs' claims, unless those limitations periods were tolled pending the panel's decision.

The legislature enacted the TSFA on October 7, 1988, approximately two years and two months after plaintiffs' claims for relief accrued July 31, 1986, and before the statutes of limitations had run. All claims then pending were barred under the terms of the Act. Utah Code Ann. § 7–21–4(5)(e). That bar extended to all claims for relief "arising from or related to the thrift institutions, the guarantee corporation [i.e., the ILGC], or their insolvencies, regardless of whether or when the claims or actions are filed or asserted." *Id.* § 7–21–4(5).[16] Therefore, all of plaintiffs' claims alleged in their first three complaints were, in effect, a legal nullity. The TSFA barred all these claims before either the three- or four-year statute of limitations had run. As stated, only claims which the panel ultimately approved could be pursued. *Id.* § 7–21–4(5)(e).

---

16. That section states:

The parties shall agree to each of the following terms with respect to any amount, other than recoveries assigned to the state by the transfer of the share in liquidation proceeds, that the state, the depositors, and the state's settling carriers recover from claims against others in the class action or any other persons, except for claims that may exist against nonsettling carriers, whether or not the state or the depositors are parties, arising from or related to the thrift institutions, the guaranty corporation, or their insolvencies, regardless of whether or when the claims or actions are filed or asserted:

(a) The state and its settling carriers shall join in the depositor class action by intervention on the side of the depositors as plaintiffs or in such other designation as the class action court shall agree adequately states and represents the state and the carriers' interests and standing in the litigation. The state, the depositor class, and the carriers may collectively or separately appoint and instruct counsel as they consider appropriate, and the settling carriers may participate in the class action in the name and on behalf of the state.

(b) The depositor class and the state shall share equally the first $5,000,000 recovered and shall have discretion as provided in the settlement agreement over the persons or entities from whom recovered, the timing of settlement, if any, and the nature and extent of claims reduced to judgment, compromised, or dismissed to produce that result.

(c) After the amount in Subsection (b) has been recovered, the depositor class shall be entitled to one-third, the state to one-third, and the settling carriers to one-third of additional recoveries, after deducting costs of litigation, obtained in actions pursued by the state, the state's insurance carriers, or by the class. A party recovering any amount under this provision shall do so subject to a division of the funds or property in accordance with the formula in this subsection.

. . . .

(e) The future litigation in this subsection is subject to the approval of the Thrift's Panel as provided in Section 7–21–7.

Utah Code Ann. § 7–21–4(5).

Under the trial court's ruling, the three- and four-year statutes of limitations ran on plaintiffs' claims on July 31, 1989, and July 31, 1990. The trial court made this ruling even though plaintiffs' claims were stayed pending action by the panel and even though plaintiffs' proposed claims were not required to be filed with the panel until February 25, 1991, and were not approved until February 10, 1992, some nineteen months after the four-year statute of limitations had run. In other words, under the trial court's ruling, the panel engaged in a totally meaningless charade because it was literally impossible for plaintiffs to litigate any claim authorized by the panel if the limitations period expired before a claim could be asserted.

We note that in deciding whether to authorize plaintiffs' claims, the panel was required to consider (1) whether the claims appeared to be grounded in fact, sanctioned by existing law, or supported by a good faith argument for the extension, modification, or reversal of existing law, and (2) whether equitable considerations warranted continued litigation. Utah Code Ann. § 7–21–7(3)(a)–(b). Under this provision, then, the panel could not have authorized claims if the statutes of limitations actually barred them as the trial court held.

Finally, title 78, chapter 12 of the Utah Code, which contains the statutes of limitations that govern this case, also contains the tolling statute, which states, *"When the commencement of an action is stayed by . . . a statutory prohibition the time of the . . . [statutory] prohibition is not part of the time limited for the commencement of the action."* Utah Code Ann. § 78–12–41 (emphasis added). Sections 7–21–4(5)(e) and 7–21–7 of the TSFA imposed a "statutory prohibition" on the prosecution of all claims arising out of the failure of the thrifts and the insolvency of the ILGC. In short, the TSFA was a "statutory prohibition" on the filing of plaintiffs' claims, and section 78–12–41 mandates that the time of the prohibition is not part of the time limited for the commencement of the action. Thus, the plain language of section 78–12–41 tolled the statutes of limitations applicable to plaintiffs' claims until the panel authorized those claims.

In sum, the TSFA tolled the running of the three- and four-year limitations periods from October 7, 1988, the date of the TSFA's enactment, until February 10, 1992, the date the panel issued its report authorizing plaintiffs' claims for litigation. This provided a period of twenty-two months from the time the panel report was issued for plaintiffs to file those claims subject to the four-year period and ten months for them to file claims subject to the three-year period. The filing of plaintiffs' fourth amended complaint on May 19, 1992, approximately three months after the issuance of the report, was clearly timely.

### B. Laches

■ The trial court ruled that the doctrine of laches served as a supplemental ground to dismiss the claims against C & L. In its memorandum decision, the trial court wrote:

Plaintiffs' long delay in bringing this action, including an 18–month period between the filing of the original complaint and the effective date of the TSFA, coupled with the intervening death of Coopers' managing partner who had been directly involved with the audits of Copper State, and the dispersal of other knowledgeable witnesses, operate to Coopers' prejudice.

■ This decision was incorrect. The doctrine of laches is an equitable defense which arises in cases where the plaintiff seeks equitable relief. *See American Tierra v. City of West Jordan,* 840 P.2d 757, 763 (Utah 1992). A defendant may successfully assert this defense when a plaintiff seeking equity unreasonably delays in bringing an action and this delay prejudices the defendant. *Borland v. Chandler,* 733 P.2d 144, 147 (Utah 1987). However, where the plaintiff's claims are based in law, the statute of limitations, not the doctrine of laches, governs the timing surrounding a plaintiff's filing of a complaint. *See United States v. Mack,* 295 U.S. 480, 489, 55 S.Ct. 813, 818, 79 L.Ed. 1559 (1935) ("Laches within the term of the statute of limitations is no defense at law.").

In the present case, because plaintiffs' claims against C & L are based in law, the trial court's supplemental dismissal of these claims on the basis of the equitable doctrine of laches was incorrect.[17]

## IV. CLAIMS AGAINST FORMER OFFICERS AND DIRECTORS OF UTAH THRIFTS

### A. Facts

### 1. Depositor Class Action

Plaintiffs' first, second, and third amended complaints included fictitious designations for unknown defendants identified as the "officers [and] directors ... of the five failed thrifts ... from 1982 to 1986." In the fourth amended complaint, plaintiffs replaced these fictitious designations, specifically naming former officers and directors of Western Heritage Roy B. Moore, Merrill Bean, and Paul Frampton (Western directors) as defendants in the class action.[18] The fourth amended complaint asserted claims of (1) negligence, (2) gross negligence and/or recklessness, (3) prima facie tort, (4) constructive fraud, (5) negligent misrepresentation, (6) deceit, and (7) state securities violations. These claims were based on the director's alleged "abysmal, illegal, self-interested lending practices and [their] pattern of understating loss reserves."

In addition, plaintiffs brought claims against Larry H. Miller in his role as an officer and director of Commerce Financial. Specifically, plaintiffs asserted claims of civil conspiracy, deceit, state securities violations, constructive fraud, and prima facie tort. Plaintiffs basically allege three forms of wrongdoing against Miller: (1) misrepresenting the financial condition of Commerce Financial in financial reports filed with the DFI, (2) misusing Commerce Financial's funds for his own personal gain, and (3) allowing Commerce Financial to accept deposits at a time when he knew that neither Commerce Financial nor the ILGC would be able to back these deposits.

### 2. Receiver/Liquidator Actions

In July 1986, following the collapse of Utah's thrift industry, the DFI took possession of Western Heritage. On September 26, 1986, the DFI commissioner filed a complaint on behalf of Western Heritage (receiver/liquidator action) against its former officers and directors, including Moore, Bean, and Frampton.[19] The complaint, as amended, asserted four causes of action: (1) breach of fiduciary duty, (2) negligence, (3) breach of contract, and (4) professional malpractice.

In 1987, Grant Thornton was appointed receiver for Western Heritage.[20] Following the passage of the TSFA, Thornton attempted to gain panel approval of the claims set forth in the receiver/liquidator action. The panel, however, determined that these claims need not be submitted inasmuch as its approval was required only for claims asserted in the depositor class action. The panel stated that it "has considered Grant Thornton's submissions and ... concluded that Grant Thornton is not a party to the class action settlement or subject to the Panel's screening process."

Subsequently, in July 1992, Thornton transferred to the DFI commissioner all control, custody, and supervision of any and all possible claims which Thornton, on behalf of Western Heritage, had pending in the receiver/liquidator action. Following this transfer, the commissioner moved to consolidate the

---

17. The trial court also held that the State and Cal Union lacked standing to participate as plaintiffs in the depositor class action and that the panel failed to approve some of plaintiffs' claims against the accountant defendants. Because our analysis of these issues applies to the individual defendants as well as to the accountant defendants, we will treat these issues in parts V and VI of this opinion respectively.

18. Moore and Bean were directors from 1982 through 1984, while Frampton was a director from 1983 through 1984.

19. Miller, in addition to serving as an officer and director of Commerce Financial, was appointed by the DFI to serve as the liquidator for the failed thrift. However, plaintiffs made no claims in their fourth amended complaint against Miller in his role as liquidator of Commerce Financial.

20. Thornton was also appointed receiver for Charter, Copper State, and Interlake.

receiver/liquidator action into the depositor class action lawsuit. In November 1992, the trial court granted the motion and consolidated the actions.

### 3. Consolidated Action

After the two actions had been consolidated, Moore moved to dismiss all claims against him on the grounds of (1) expiration of all applicable statutes of limitations, (2) lack of standing, and (3) lack of panel authorization of the receiver/liquidator claims. Bean and Frampton, however, did not move to dismiss the complaints. Instead, they each chose to answer the complaints and assert as affirmative defenses the same grounds for dismissal as Moore had asserted in his motion to dismiss. The trial court granted Moore's motion on the basis of its determination that (1) the depositor class action claims were all time-barred under the applicable statutes of limitations, and (2) the receiver/liquidator claims needed but did not have panel approval. The trial court sua sponte included Bean and Frampton within the ambit of its ruling, thereby dismissing all claims asserted against the Western directors.

Miller, like Moore, responded to the fourth amended complaint by moving to dismiss on the basis of expiration of all applicable statutes of limitations, lack of standing, and lack of panel authorization for one of the claims. On August 31, 1993, the trial court granted Miller's motion.

On appeal, plaintiffs contend that the trial court erred in concluding that the depositor class action claims were time-barred and that the claims asserted in the receiver/liquidator action required panel approval.[21] We address these contentions in turn.

### B. Analysis

### 1. Depositor Class Action

The trial court ruled that all of plaintiffs' claims in the depositor class action were

barred by the applicable statutes of limitations. In the portion of this opinion addressing claims against the accountant defendants, we disagreed with the trial court and held that the TSFA tolled the limitations periods, thereby allowing plaintiffs to proceed with their claims. The same analysis applies to plaintiffs' claims against the director defendants. The passage of the TSFA tolled the applicable limitations periods from October 7, 1988, until February 10, 1992, the date the panel issued its report authorizing plaintiffs' claims. From that date, plaintiffs had a minimum of ten months to file those claims against the director defendants. Because plaintiffs filed their fourth amended complaint on May 19, 1992, approximately three months after the issuance of the report, it was clearly timely.[22]

### 2. Panel Approval of Receiver/Liquidator Claims

■ On appeal, plaintiffs maintain that the panel approval requirements of the TSFA apply only to claims brought by the depositor class, the State, and the settling carriers. Thus, they argue, the trial court erred in dismissing the receiver/liquidator claims on the ground that these claims needed panel approval. The only section of the TSFA pertaining to the panel is section 7–21–7, which details the panel's establishment, functions, and procedures. This section specifically states that the panel has binding power to authorize or refuse to authorize litigation of claims "arising from *the interests of the depositor class, the [S]tate, or the settling carriers.*" Utah Code Ann. § 7–21–7(1) (emphasis added).

Unlike those claims which require panel approval, the claims involved in the receiver/liquidator action do not arise from the interests of the depositor class, the State, or the settling carriers, but rather from the interests of Western Heritage. Specifically,

---

21. Plaintiffs also appeal the trial court's ruling that the State and Cal Union lacked standing to participate as plaintiffs' in the depositor class action. We address this issue in part V.

22. As discussed in the portion of this opinion addressing claims against the accountant defen-

dants, the two-year statute of limitations on plaintiffs' state securities law claims expired two months prior to the passage of the TSFA, thereby barring those claims. The same analysis applies to plaintiffs' state securities law claims against individual defendants.

because Western Heritage is in liquidation, the interests at stake include those of Western Heritage's secured and unsecured creditors, former employees, and former officers and directors. *See* Utah Code Ann. § 7–2–15(1). We recognize that some of Western Heritage's depositors may receive a portion of the liquidation proceeds under section 7–2–15. *See* Utah Code Ann. § 7–2–15(1)(d) (stating that claims of depositors have fourth priority in the distribution of liquidation proceeds). However, while some individual depositors of Western Heritage may be involved in the depositor class action lawsuit, the two groups of depositors are not coextensive. Consequently, the mere possibility that Western Heritage's depositors may eventually receive some residual liquidation proceeds from the receiver/liquidator action is not sufficient to align their interests with the interests of the depositor class and thus bring them within the purview of section 7–21–7(1).

Moreover, the TSFA itself makes no reference to receiver/liquidator actions, nor does it suggest that such actions are subject to its provisions. This is entirely consistent with the fact that claims in receiver/liquidator actions are not brought pursuant to any section of the TSFA, but instead are governed by a separate chapter of the Utah Code, namely, sections 7–2–1 to –23. At the time the TSFA was passed, numerous receiver/liquidator actions had been filed and were pending. If the legislature had intended for these actions to be included within the scope of the TSFA, it could have so stated. Instead, the TSFA specifically limited the requirement of panel approval to claims brought under section 7–21–4(5). *See* Utah Code Ann. § 7–21–7.

In the present case, the complaint in the receiver/liquidator action clearly stated that it was filed pursuant to sections 7–2–1 to –23. The complaint did not mention section 7–21–4(5) or any other provision of the TSFA. Moreover, when Grant Thornton, as receiver of Western Heritage, attempted to gain panel approval for the claims in the receiver/liquidator action, the panel specifically declined to consider the merits of these claims. Instead, the panel dismissed Thornton from its proceedings, concluding that inasmuch as Thornton was not part of the depositor class, the receiver/liquidator claims did not require panel approval.

On the basis of the foregoing analysis, we conclude that the trial court erred in determining that the claims in the receiver/liquidator action required panel approval and in dismissing such claims on that basis.[23]

## V. STANDING OF THE STATE AND CAL UNION

■ The trial court further held that the State and Cal Union lacked standing to assert claims that seek recovery for alleged injury only to the depositors. The trial court reasoned that because the State and Cal Union alleged no direct injuries and because the settlement agreement between the depositors, the State, and Cal Union was neither an assignment of claims nor a subrogation agreement, neither party had standing to proceed in the depositor class action. On appeal, plaintiffs contend that the legislature, in passing the TSFA, expressly granted the State and Cal Union standing to join the depositor class action. We agree.

■ Section 7–21–4(5)(a) of the TSFA reads in part as follows:

(a) The state and its settling carriers *shall* join in the depositor class action by intervention on the side of the depositors as plaintiffs or in such other designation as the class action court shall agree adequately states and represents the state and the carriers' interests and standing in the litigation.

(Emphasis added.) This language, combined with the remainder of section 7–21–4, clearly indicates that the legislature intended to confer upon the State and Cal Union standing to proceed in the present action. It is within the legislature's power to grant a party standing, *see, e.g., Pike Countryside Annex-*

---

23. We also note that several other receiver/liquidator actions were consolidated in this action. These include *Commissioner of Financial Institutions v. Touche, Ross & Co.*, Civil No. 890904622CV, *Industrial Loan Guaranty Corp. v.*

*Coopers & Lybrand*, Civil No. 910901588CV, and *Copper State Thrift & Loan Co. v. Coopers & Lybrand*, Civil No. 910901587CV. Inasmuch as these actions were dismissed on the same ground, they were also improperly dismissed.

*ation v. Vernal City,* 711 P.2d 240, 242 (Utah 1985), and where it has expressly chosen to do so, a court should not declare otherwise. Accordingly, we conclude that the trial court erred in determining that the State and Cal Union lacked standing to proceed as parties in the depositor class action.

## VI. SCREENING PANEL APPROVAL OF PLAINTIFFS' CLAIMS

The trial court dismissed several of plaintiffs' claims against the accountant defendants and one claim against Miller for the independent reason that the claims were not properly presented to the panel or that the panel did not expressly approve them. In particular, the trial court barred claims for breach of contract and breach of warranty against all accountant defendants; claims against Peat for the conduct of its partner, Charles Johnson; a claim against Miller alleging civil conspiracy; and claims against Peat based on its audit reports on Western Heritage's financial statements and against C & L based on its audit reports on Copper State's financial statements.[24] On appeal, plaintiffs contend that the panel specifically reviewed and approved each of these claims.

In making its determinations as to which claims to approve, the panel was required to consider, among other factors, (1) whether the claims appeared to be grounded in fact, sanctioned by existing law, or supported by a good faith argument for the extension, modification, or reversal of existing law; and (2) whether equitable considerations warranted continued litigation. Utah Code Ann. § 7–21–7(3)(a)–(b). Following an extensive hearing, the panel issued a report approving most claims but barring litigation of "[c]laims alleging liability premised on audit opinions that were either adverse or 'going concern' opinions" on the grounds that adverse or "going concern" audit opinions should have put the ILGC and the State on notice of problems at the thrifts. The panel further refused to authorize litigation of any claims premised on an alleged duty of an accountant to be a "whistle blower" to the depositors or the public. Against this backdrop, we review

the trial court's decision dismissing certain of plaintiffs' claims.

### A. Claims for Breach of Contract and Breach of Warranty

■ In their fourth amended complaint, plaintiffs alleged claims of breach of contract and breach of warranty against all accountant defendants. Plaintiffs admit that the "proposed form of complaint" they submitted to the panel did not contain claims titled breach of contract or breach of warranty, but contend that during the hearing the panel specifically approved the facts underlying these claims. The trial court, however, barred the claims, finding that the allegations supporting the breach of contract and breach of warranty claims were "simply rephrased negligence claims." We agree with the trial court.

As noted in footnote 14, plaintiffs do not claim that the accountant defendants failed to perform their contracts. The wrongs plaintiffs allege are that the accountants failed to perform those audits in accordance with the duties imposed upon them by Utah law and the professional standards of the accounting profession. In sum, plaintiffs claim that defendants failed to exercise the reasonable care which the law requires.

We note that the panel specifically approved litigation of claims based on theories of negligence against all accountant defendants. Thus plaintiffs may pursue remedies in tort based on the facts contained in their claims titled breach of contract and breach of warranty.

### B. Claims Against Peat for Johnson's Conduct

■ The trial court found that the "proposed form of complaint" plaintiffs submitted to the panel did not contain claims against Peat on the ground that Peat was vicariously liable for the conduct of its partner Johnson during the time Johnson served as an ILGC trustee. On the basis of this finding, the trial court dismissed claims in plaintiffs' fourth amended complaint based on John-

---

24. The trial court also barred plaintiffs' state securities law claims on this supplemental basis.

Because we hold that these claims are time-barred, we do not address them here.

son's conduct, ruling that they had not been presented to or approved by the panel. While the trial court is correct in stating that these claims were not included in plaintiffs' "proposed form of complaint," our review of the record demonstrates that they were nevertheless presented to and approved by the panel.

In particular, we note that Johnson, through his attorney, submitted papers to the panel defending his work as an ILGC trustee, arguing that the estimates he prepared on the ILGC fund balance should not be the *"basis for a claim by the depositors"* because the depositors never saw the estimates and because the estimates were conservative. Johnson further argued that plaintiffs were attempting to mislead the panel by referring to these estimates. Despite Johnson's contentions, the panel, in its report, specifically approved all claims against Johnson, noting that some of the claims arose from Johnson's service on the "ILGC board of directors." [25]

### C. Civil Conspiracy Claim Against Miller

■ The trial court ruled that because plaintiffs did not specifically identify Miller to the panel "as a person responsible for the failure of the entire ILGC system" the civil conspiracy claim against Miller in plaintiffs' fourth amended complaint was neither presented to nor approved by the panel. In his brief, Miller supports the trial court's conclusion, arguing that plaintiffs' initial claims against him only sought recovery of damages suffered by Commerce Financial depositors. He argues that because plaintiffs' civil conspiracy claim in their fourth amended complaint seeks damages from him well beyond the losses suffered by the Commerce Financial depositors, it was neither presented to nor approved by the panel.

We disagree. Plaintiffs' seventy-fourth cause of action in their "proposed form of complaint" alleged a claim of civil conspiracy against Miller, and plaintiffs submitted a legal memorandum to the panel stating that civil conspiracy was charged against several

defendants, including Miller. Moreover, at the hearing before the panel, Miller argued, on numerous occasions, that the "Panel should not authorize ... [claims] alleging his participation in a civil conspiracy." Following the hearing, the panel approved, without exception, all claims against the individual defendants, including the civil conspiracy claim against Miller.

We do not find it significant that plaintiffs' civil conspiracy claim against Miller seeks damages in an amount greater than the amount originally stated to the panel. In its report, the panel did not limit plaintiffs' damage claims to certain amounts and further recognized that plaintiffs were presenting their claims with only "a subset of the facts that discovery would reveal" and that further discovery would lead to more specific information. Certainly one area where discovery would produce more information would be the amount of damages plaintiffs allegedly suffered. Accordingly, we conclude that the trial court erred in determining that the civil conspiracy claim against Miller was not presented to or approved by the panel.

### D. Claims Against Peat and C & L Based on Audit Reports

■ In its report, the panel refused to authorize "claims alleging liability premised on audit opinions that were either adverse or 'going concern' opinions." The trial court relied on this in barring claims in plaintiffs' fourth amended complaint against Peat based on Peat's audit reports on Western Heritage's financial statements and against C & L based on C & L's audit reports on Copper State's financial statements. The trial court reasoned that because the audit reports Peat and C & L provided on their respective clients' financial statements for the period ending December 31, 1985, contained "going concern" qualifications, plaintiffs "could not have reasonably relied on prior audit reports" once the "going concern" audit reports had been issued. On appeal, plaintiffs argue that the panel barred only claims based on *specific* audits which result-

---

**25.** Johnson and Peat stipulated that Johnson's conduct as an ILGC trustee was within the course and scope of his employment and that the doctrine of respondeat superior bound Peat to Johnson's actions and omissions. Plaintiffs, in turn, agreed not to name Johnson as a party.

ed in "going concern" qualifications and expressly approved claims based on all other audit reports. Plaintiffs contend that their claims in the fourth amended complaint are based on Peats' and C & L's audits for the years 1982, 1983, and 1984 and that they did not state a claim based on the 1985 audits.

Upon reviewing the record, we agree with plaintiffs. In its report, the panel stated the following concerning claims against the accountant defendants:

Claims alleging liability premised on audit opinions that were either adverse or "going concern" opinions are barred.

. . . .

All other claims asserted against the prospective accountant defendants are permitted . . . .

Our rationale for this decision can be stated concisely. On the merits, the plaintiffs have presented good faith claims that the *prospective accounting defendants were, e.g., negligent in failing to give "going concern" opinions to the Thrifts. A "going concern" opinion arguably was appropriate given the ILGC's insolvency and other factors unique to particular Thrifts.*

(Emphasis added.) The panel clearly approved claims against the accountant defendants based on audit reports that did not contain "going concern" qualifications. It is undisputed that Peat's and C & L's audit reports on the financial statements of their respective clients for the years 1982, 1983, and 1984 did not contain "going concern" qualifications. Thus, because plaintiffs' claims are based on the 1982, 1983, and 1984 audit reports, we conclude that the panel specifically approved them. Moreover, the trial court's conclusion that plaintiffs "could not have reasonably relied on prior audit reports" once the "going concern" qualification was issued in 1985 was not reflected in the panel's report; accordingly, this issue is more appropriately settled on the merits.

## VII. CONCLUSION

The legislature created the TSFA in response to the collapse of the thrift industry in the state of Utah. A central purpose of the TSFA was to assist plaintiffs in the resolution of their claims against the instant defendants. We now hold that the passage of the TSFA tolled the statutes of limitations applicable to the majority of plaintiffs' claims. Accordingly, the decision of the trial court is reversed, and the case is remanded for proceedings consistent with this opinion.

STEWART, Associate C.J., and HOWE, J., concur.

RUSSON, Justice, dissenting:

I dissent. I disagree with the majority that the TSFA serves to toll the statutes of limitations applicable in this case.

The TSFA contains no provision tolling the statutes of limitations. Indeed it provides:

This chapter is not intended to reduce or eliminate any discretion and control that the court in the depositor class action may have under Rule 23 of the Utah Rules of Civil Procedure or any other rule of law over the process and substantive outcome of the depositor class action.

Utah Code Ann. § 7–21–1(4). Moreover, the act is replete with language indicating that its purpose is to expedite the litigation of all claims arising out of the failure of the thrifts "so that the entire matter may be put to rest for the benefit of the public." Utah Code Ann. § 7–21–1(6); *see also* Utah Code Ann. § 7–21–1(1) (stating that purpose of chapter is to avoid further "unnecessary delay and expense").

Clearly, the TSFA's plain language indicates that it was not intended to supplant any substantive or procedural rule of law, including statutes of limitations. Statutes of limitations are designed to compel the exercise of a right of action within a reasonable time. If a party fails to bring his or her action within the prescribed limitations period, that party's action is subject to dismissal because of the defending party's vested right to an affirmative defense of statutes of limitation. *Roark v. Crabtree*, 893 P.2d 1058, 1062–63 (Utah 1995). Consequently, to conclude that this act tolls the limitations periods would affect the court's control over the action, in direct contradiction of the act's plain language. *See Bonham v. Morgan*, 788 P.2d 497, 500 (Utah 1989) (per curiam) ("Un-

ambiguous language in the statute may not be interpreted to contradict its plain meaning.").

Furthermore, "statutes of limitation are intended to compel the exercise of a right of action within a reasonable time and to suppress stale and fraudulent claims so that claims are advanced while evidence to rebut them is still fresh." *Horton v. Goldminer's Daughter,* 785 P.2d 1087, 1091 (Utah 1989). Ten years have passed since the events giving rise to the causes of action in this case transpired. Under the majority's opinion, however, claims could be filed ten, twenty, or even thirty years after those events occurred. In that time, corporations change, documents are lost or destroyed, and memories fade, which is the very purpose for which statutes of limitations are enacted.

The majority's claim that the applicable statutes of limitations were tolled by the TSFA is based upon the unfounded assertion that all pending claims were barred under section 7–21–4(5)(e) of the Act. This section merely requires that "claims ... arising from or related to the thrift institutions, the guaranty corporation, or their insolvencies, regardless of whether or when the claims or actions are filed or asserted" are "subject to the approval of the Thrifts Panel as provided in Section 7–21–7." Utah Code Ann. § 7–21–4(5), (5)(e). Furthermore, section 7–21–7 only provides, "This panel shall have binding power to authorize or refuse to authorize any litigation in these claims." *Id.* § 7–21–7(1). Nothing in these sections can be construed as requiring such authorization prior to the filing of a lawsuit in district court. To the contrary, in stating that these claims are subject to the panel's approval *"regardless of whether or when the claims or actions are filed,"* *id.* § 7–21–4(5) (emphasis added), the legislature clearly instructed that panel review could take place *after* an action was filed. If the legislature intended otherwise, it could have expressed such an intention in plain language. *See Johnson v. State Tax Comm'n,* 17 Utah 2d 337, 341–42, 411 P.2d 831, 834 (1966).

Indeed, had the legislature desired to create a prelitigation panel whose review would toll the applicable statutes of limitations, a ready model exists in the Utah Health Care Malpractice Act. Utah Code Ann. §§ 78–14–1 to –16. As part of this Act, the legislature created a panel to determine whether malpractice claims against health care providers have merit. *Id.* §§ 78–14–12, –14. In section 78–14–12, the legislature made clear that panel review is to be a precondition to the commencement of a malpractice action: "The proceedings are informal, nonbinding, ... *but are compulsory as a condition precedent to commencing litigation." Id.* § 78–14–12(1)(c) (emphasis added). In addition, to remove any doubt that panel review is to occur prior to any litigation, the legislature used the term "prelitigation" to describe the panel or its activities no less than ten times. *Id.* § 78–14–12(1)(b), (2)(a), (3), (5)(a), (7), (8)(b). Finally, the legislature unambiguously provided that panel review would toll the applicable statute of limitations: "The filing of a request for prelitigation panel review under this section tolls the applicable statute of limitations until 60 days following the division's issuance of an opinion by the prelitigation panel." *Id.* § 78–14–12(3). Thus, a cursory examination of this section reveals that the legislature is quite adept at both mandating panel review of claims as a precondition to litigation and tolling applicable statutes of limitations.

A comparison of the Utah Health Care Malpractice Act with the TSFA reveals that the legislature purposefully did not exercise its drafting proficiency to toll statutes of limitations in the thrifts context. The TSFA provides no evidence either that the thrifts panel review is to take place prior to the filing of a complaint or, more to the point, that panel review should toll the applicable limitations period. To the contrary, as discussed above, the TSFA's language expressly provides that procedural rules such as statutes of limitations are not to be "reduce[d] or eliminate[d]." *See id.* § 7–21–1(4).

Furthermore, the majority's position that the TSFA triggers the tolling statute calls into question the constitutionality of the TSFA. Article VI, section 26 of the Utah Constitution states, "No private or special law shall be enacted where a general law can be applicable." Interpreting the TSFA as

tolling the claims of only those who were party to the settlement would raise a serious question as to whether the TSFA was a "special law" under the Utah Constitution. The majority opinion would toll the statutes of limitations for those who were party to the settlement while others who had claims against one or more of the defendants would be subject to the general provisions of Utah law.

The legislature was obviously concerned over the constitutionality of the TSFA wherein it specifically stated, "This chapter is not intended to reduce or eliminate ... any ... rule of law over the process and substantive outcome of the depositor class action." Utah Code Ann. § 7–21–1(4). This certainly includes statutes of limitations.

Finally, there was adequate time to convene a panel and screen claims between the passage of the TSFA and the running of the applicable statutes of limitations. The TSFA was passed on October 7, 1988, leaving over nine months until certain claims expired on July 31, 1989, and over twenty-one months until certain claims expired on July 31, 1990. The majority opines that "under the trial court's ruling, the panel engaged in a totally meaningless charade because it was literally impossible for plaintiffs to litigate any claim authorized by the Panel if the limitations period expired before a claim could be asserted." However, the panel could have been formed, claims reviewed, and complaints filed well within the period allowed by the statutes of limitations. In the alternative, plaintiffs could have filed their complaints immediately and then asked the trial court to stay further proceedings until the panel completed its review and approval process.

In conclusion, as to the depositor class action claims against defendants Touche, Peat, Deloitte, C & L, Moore, Bean, Frampton, and Miller, I would hold that the trial court correctly determined that the applicable statutes of limitations were not tolled by the passage of the TSFA. Accordingly, I would affirm the trial court's dismissal of these claims. I do agree with the majority, however, that the trial court erred in deter-

mining that the claims in the receiver/liquidator action required panel approval.

ZIMMERMAN, C.J., concurs in the dissenting opinion of RUSSON, J.